REEVES, Appellant and Cross–Appellee,

v.

HEALY et al., Appellees and Cross–Appellants.

[Cite as *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–418.

Decided March 29, 2011.

770

Bunda, Stutz & DeWitt, P.L.L., Robert A. Bunda, and Barbara E. Machin, for appellant and cross-appellee.

Freund, Freeze & Arnold, Mark L. Schumacher and Sandra R. McIntosh, for appellees and cross-appellants.

BRYANT, Presiding Judge.

{¶ 1} Plaintiff-appellant and cross-appellee, Deborah Reeves, appeals from a judgment of the Franklin County Court of Common Pleas denying her motion for new trial on noneconomic damages only, granting the motion of defendants-appellees and cross-appellants, Heather C. Healy, D.O., and Immediate Health Associates, Inc. ("IHA"), for a new trial on all issues, and granting the motion of defendant-appellee, Joyce Maden, for a directed verdict. Defendants Dr. Healy and IHA cross-appeal from the trial court's judgment denying their motion for judgment notwithstanding the verdict, denying their motion for partial summary judgment, and granting plaintiff's motion in limine.

## I. Facts and Procedural History

{¶ 2} Plaintiff, a 41–year–old woman, awoke around 11:30 a.m. on December 13, 2005, yawned, and immediately noticed difficulty focusing her left eye. The condition persisted throughout the day, and around 6:00 p.m., plaintiff went to Mount Carmel St. Ann's ("St. Ann's") emergency department. A triage nurse, Esther Thompson, examined plaintiff and documented her findings. Thompson noted that both the left side of plaintiff's mouth and her left eyelid appeared to droop. At Thompson's request, plaintiff recounted her medical history, which included artificial-heart-valve surgery in 1994 following an infection and heart attack. As a consequence, plaintiff was placed on a daily dose of Coumadin, a drug that lessens the tendency of blood to clot. Plaintiff reported that she had not taken Coumadin for nearly a year because she did not have health insurance and could not otherwise afford the prescription.

{¶ 3} After Thompson examined plaintiff, Dr. Healy, an emergency-room physician, and Maden, a physician assistant, both of whom IHA employed,

separately examined plaintiff. Both noted that plaintiff's left eyelid drooped and that she could not move her left eye medially. Although neither observed any mouth droop or any other neurological deficits, both noted Thompson's documentation regarding the left-eyelid and mouth droop. Plaintiff apprised both Dr. Healy and Maden that she had an artificial heart valve and had not taken her prescribed Coumadin for at least one year. Dr. Healy and Maden discussed a plan of treatment, which included laboratory testing and a CT scan of the brain to determine if a stroke had caused plaintiff's symptoms.

{¶ 4} The CT scan did not disclose any evidence of a stroke, but it revealed the presence of sinusitis, which led to a second CT scan of the facial bones confirming sinusitis. Dr. Healy ultimately diagnosed plaintiff with pupil-sparing third-cranial-nerve palsy based upon the eyelid droop, the negative brain CT scan, the facial CT scan revealing sinusitis, and the lack of any other physical or neurological deficits.

{¶ 5} Later that evening, Dr. Healy consulted an ophthalmologist, Dr. Louise Doyle, and reported that plaintiff's symptoms as a "droopy eyelid and limitation of gaze." Dr. Healy further reported that plaintiff was otherwise healthy, her vital signs were stable, she had a normal brain CT scan, she had no additional neurological deficits, and she had sinusitis. Upon these factors, Dr. Doyle confirmed Dr. Healy's diagnosis and agreed to see plaintiff the next day in her office.

{¶ 6} Dr. Healy discharged plaintiff with a prescription for an antibiotic and instructions to call Dr. Doyle the next day for an appointment. Rather than follow up with Dr. Doyle, plaintiff the next day went to the Ohio State University Medical Center ("OSUMC") Eye Clinic. A resident at the clinic referred plaintiff to the OSUMC emergency department, where new symptoms were detected, including numbness of plaintiff's right hand and face and slurred speech. The symptoms resulted in further testing and plaintiff's admission to OSUMC with the diagnosis of a midbrainstem stroke. Physicians at OSUMC ultimately administered the blood-thinning drug heparin. Following discharge from OSUMC, plaintiff spent approximately one month in Dodd Hall, OSUMC's rehabilitation center, where she received speech, physical, and occupational therapy. According to Dr. William Pease, an OSUMC rehabilitation specialist, plaintiff will never again work, drive a car, or live completely independently.

{¶ 7} On February 28, 2008, plaintiff followed her initial complaint with an amended medical-malpractice complaint against Dr. Healy, IHA, Maden, Dr. Doyle, Dr. Doyle's employer, Mid–Ohio Ophthalmic Consultants, and St. Ann's. Plaintiff alleged they negligently failed to manage, diagnose, and treat her stroke on December 13, 2005, proximately causing her to suffer severe and potentially permanent physical injuries. Dr. Healy, IHA, and Maden filed a joint answer on

March 8, 2008, asserting, among others, the affirmative defenses of assumption of the risk and contributory negligence. Dr. Doyle, Mid–Ohio, and St. Ann's eventually were dismissed from the lawsuit.

{¶ 8} On February 27, 2009, Dr. Healy, IHA, and Maden filed a motion for partial summary judgment. Maden sought summary judgment on grounds that she, as a physician assistant, was not responsible for the decisions made in the course of plaintiff's treatment and thus was not negligent. Dr. Healy and IHA sought summary judgment on their asserted affirmative defenses of assumption of the risk and contributory negligence, arguing that because plaintiff did not consistently take the Coumadin prescribed after her heart-valve-replacement surgery in 1994, she assumed the risk of the stroke she suffered on December 13, 2005, or at least was contributorily negligent in failing to take the medication.

{¶ 9} In a decision and entry filed May 14, 2009, the trial court denied the motion for partial summary judgment. Plaintiff then filed a motion in limine seeking to prevent Dr. Healy and IHA from asserting either affirmative defense at trial. The trial court, through a magistrate, granted plaintiff's motion and denied defendants' subsequent motion for reconsideration.

{¶ 10} Beginning on November 19, 2009, a jury trial was held before the trial court's magistrate. Upon motion of defendants at the close of all the evidence, the magistrate directed a verdict for Maden. After commencing deliberations on November 23, 2009, the jury twice returned verdicts incompatible with the answers to interrogatories. Following further deliberations aided by the court's additional instructions, the jury returned a verdict for plaintiff, concluding that Dr. Healy was negligent in her care and treatment of plaintiff and that her negligence had proximately caused plaintiff's injuries. The parties stipulated at trial that any finding of negligence against Dr. Healy would apply to IHA. The jury awarded plaintiff $450,000 in economic damages and $0 in noneconomic damages.

{¶ 11} Citing the prior inconsistencies in the jury's verdicts and answers to interrogatories, Dr. Healy and IHA orally moved for a mistrial or a new trial, or both, on grounds that the jury had lost its way in rendering a verdict for plaintiff. The magistrate deferred an immediate ruling and permitted the parties to brief the issue. By entry dated January 7, 2010, the magistrate indicated he would hold his decision on the mistrial issue in abeyance until he had an opportunity to consider granting a new trial pursuant to Civ.R. 59. The magistrate permitted the parties to file written briefs on the issue of a new trial.

{¶ 12} On March 12, 2010, defendants filed a motion for judgment notwith-standing the verdict pursuant to Civ.R. 50(B) or, in the alternative, a new trial pursuant to Civ.R. 59(A)(1) and (6). On March 15, 2010, plaintiff filed a motion for additur or, in the alternative, a new trial on noneconomic damages only. In a

decision filed April 6, 2010, the magistrate granted defendants' motion for a new trial on all issues, granted plaintiff's motion for a new trial on noneconomic damages to the extent that the new trial would encompass all issues, including economic and noneconomic damages, and denied plaintiff's motion for additur. The trial court, on May 14, 2010, filed a final judgment entry adopting the magistrate's April 6, 2010 decision.

{¶ 13} Plaintiff filed a notice of appeal, and defendants cross-appealed.

## II. Assignments of Error

{¶ 14} Plaintiff assigns four errors:

*Assignment of Error No. 1:*

It was error for the trial court to grant a new trial on whether the emergency room physician breached the standard of care owed to Plaintiff, after the jury concluded that she was negligent based on credible evidence at trial.

*Assignment of Error No. 2:*

It was error for the trial court to grant a new trial on whether the emergency room physician's negligence in treating Plaintiff caused her injury after the jury found causation based on credible evidence at trial.

*Assignment of Error No. 3:*

When credible evidence supports this jury's finding of negligence, causation and economic damages, but not its failure to award non-economic damages, the trial court erred in failing to grant a new trial on non-economic damages only.

*Assignment of Error No. 4:*

The trial court erred when it granted Defendant Joyce Maden's Motion for Directed Verdict and when it reaffirmed the dismissal of Defendant Maden in its Decision on Defendant's Motion for New Trial.

{¶ 15} Defendants assign three errors on cross-appeal:

(1) The trial court erred in denying the motion of Defendants/Cross–Appellants for judgment notwithstanding the verdict.

(2) The trial court erred in denying the motion of Defendants/Cross–Appellants for partial summary judgment.

(3) The trial court erred in refusing to admit evidence of Plaintiff's contributory negligence and/or assumption of the risk at trial, including the testimony of the defense pharmacology expert.

### III. Motion for New Trial—Negligence, Causation, and Noneconomic Damages

{¶ 16} As plaintiff's first, second, and third assignments of error challenge the trial court's decision to grant a new trial on all issues, we consider them jointly.

{¶ 17} The magistrate granted defendants' motion for a new trial under Civ.R. 59(A)(1) because of irregularity in the proceedings, and under Civ.R. 59(A)(6) because the verdict was against the manifest weight of the evidence. Plaintiff's first and second assignments of error contend that the trial court erred in granting a new trial on the issues of negligence and causation respectively because the jury, based on credible evidence, consistently found Dr. Healy to be negligent, ultimately reached agreement on causation, and awarded economic damages. Plaintiff's third assignment of error argues that the trial court should have limited the new trial solely to the issue of noneconomic damages. Embracing all three assigned errors is plaintiff's contention that no irregularity occurred that warrants a new trial.

#### A. Irregularity in Proceedings

{¶ 18} Pursuant to Civ.R. 59(A)(1), a trial court may grant a new trial to all or any of the parties and on all or part of the issues if the moving party demonstrates "[i]rregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial." "In the context of a motion for a new trial, an 'irregularity' is ' "a departure from the due, orderly and established mode of proceeding therein, where a party, with no fault on his part, has been deprived of some right or benefit otherwise available to him." ' " *Ellinger v. Ho*, 10th Dist. No. 08AP–1079, 2010-Ohio-553, 2010 WL 596978, ¶ 63, quoting *Meyer v. Srivastava* (2001), 141 Ohio App.3d 662, 667, 752 N.E.2d 1011. "Whether to grant or deny a motion for a new trial on the ground set forth in Civ.R. 59(A)(1) is a decision committed to the trial court's sound discretion, and an appellate court will not reverse such a ruling absent an abuse of discretion." Id. at ¶ 63, citing *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, ¶ 39.

{¶ 19} The magistrate instructed the jury that plaintiff was required to prove, by the greater weight of the evidence, that Dr. Healy was negligent and that her negligence was the proximate cause of plaintiff's injuries. The magistrate further instructed that if plaintiff failed to prove that Dr. Healy was negligent, or failed to prove that Dr. Healy's negligence proximately caused plaintiff's injuries, the jury must enter a verdict for Dr. Healy. The magistrate also instructed that if plaintiff proved that Dr. Healy was negligent and that such negligence was the proximate cause of plaintiff's injuries, the jury must enter a verdict for plaintiff.

The magistrate twice instructed the jury to consider both economic and noneconomic damages if it found for plaintiff.

{¶ 20} The magistrate continued, explaining that the jury would be given written interrogatories to be answered in the order presented and in writing, noting that the interrogatories would provide directions on which questions to answer and whether to sign the general verdict for plaintiff or Dr. Healy. The magistrate then read and explained the interrogatories and general verdict forms, and the jury commenced its deliberations. Fifteen minutes later, after selecting a foreperson, the jury adjourned until the following Monday.

{¶ 21} On Monday morning, counsel for defendants proposed a new set of interrogatories and verdict forms on grounds that the previous interrogatories and verdict forms were confusing and repetitive. Upon ascertaining that the jury had not read the initial interrogatories and verdict forms, the magistrate, over plaintiff's objection, permitted the substitution. The trial court explained to the jury that it would be presented with new, easier-to-follow, interrogatories and verdict forms; the magistrate did not read the substituted interrogatories and verdict forms to the jury. The jury then resumed its deliberations.

{¶ 22} When the jury announced that it had arrived at a verdict, the magistrate immediately recognized problems with the verdict. The magistrate noted that the jury had affirmatively answered Interrogatory A–1, which asked whether plaintiff had proved that Dr. Healy was negligent, and explained its rationale for so finding in Interrogatory A–2. The magistrate further observed, however, that the jury checked the line labeled "No" in response to Interrogatory A–3, which asked whether Dr. Healy's negligence proximately caused plaintiff's injuries. Moreover, rather than sign the interrogatory, the foreperson marked an "X" through the page. Lastly, the magistrate pointed out the jury's failure to appropriately answer the damages interrogatories. Although the jury found plaintiff entitled to damages, it failed to enter any amount for economic damages, entered a "0" for noneconomic loss, and failed to sign the interrogatory. The magistrate sent the jury back for further deliberations.

{¶ 23} When the jury returned with a second verdict, the magistrate noted that the answers to the interrogatories were inconsistent with the general verdict. Although the jury found in Interrogatory A–1 that Dr. Healy had been negligent, in Interrogatory A–2, the jury described Dr. Healy's negligence as "Failure to consult the proper specialist (neurologist) and take correct action. Mistreatment of symptoms." In Interrogatory A–3, which asked whether Dr. Healy's negligence proximately caused plaintiff's injuries, the jury checked the line labeled "No" and signed the interrogatory. Despite finding no proximate cause, the jury entered a general verdict for plaintiff and awarded economic damages, prompting the magistrate to explain to the jury that it could not award damages upon a

finding of no proximate cause. Over defendants' objection, the magistrate provided the jury a clean set of interrogatories and verdict forms and ordered the jurors to resume deliberations.

{¶ 24} The jury then returned a third verdict, finding that Dr. Healy had been negligent by "non-consultation of neurologist and indirect treatment. Mistreatment of patient." The jury also found that Dr. Healy's negligence proximately caused plaintiff's injuries. The jury awarded $450,000 in economic damages and $0 in noneconomic damages. Consistent with its answers to the negligence and proximate-cause interrogatories, the jury entered a verdict in favor of plaintiff.

{¶ 25} Plaintiff contends that the trial court abused its discretion in granting a new trial under Civ.R. 59(A)(1). Although plaintiff initially argues that the trial court failed to specify what "irregularity" it found in the trial proceedings, the magistrate's decision clearly indicates that he found the jury's conduct to be irregular in repeatedly failing to provide proper and consistent responses to the interrogatories. Indeed, the magistrate concluded that the jury had "arrive[d] at a verdict they arbitrarily believed would meet the requirements of a fair result, without regard to the evidence that was presented by counsel and statements of law that were provided to them by [the] court."

{¶ 26} The magistrate specifically observed that the jury three times attempted "to produce answers to interrogatories and a verdict rendition that could be accepted by the court as being procedurally consistent." The magistrate found particularly troubling that the jury, on two separate occasions, answered "no" to the proximate-cause interrogatory. The magistrate concluded that "[u]pon realizing that no damages could be awarded in the presence of a 'no' response, coupled with the fact that they made it plain they wanted to award money to plaintiff, they switched their answer to the proximate cause interrogatory to 'yes.' "

{¶ 27} The magistrate also was concerned with the jury's affirmative decision to award plaintiff no noneconomic damages, despite awarding economic damages. As the magistrate stated, "The fact that the jury affirmatively chose not to award noneconomic damages is not seen as a mere oversight inasmuch as" the award "of such damages could have been easily done and would have been entirely consistent with the jury's award of economic damages."

{¶ 28} Although plaintiff argues that the jury's conduct is not an "irregularity" in the proceedings as contemplated under Civ.R. 59(A)(1), plaintiff points to no case authority supporting her proposition, and we decline to construe Civ.R. 59(A)(1) in such a narrow manner. The jury's repeated failure to return a verdict consistent with its responses to the interrogatories, coupled with its obvious confusion in following the magistrate's instructions regarding the interrogatories,

is a "departure from the due, orderly and established mode of proceeding" that resulted in defendants' being deprived of the right to a fair trial and just verdict.

{¶ 29} Plaintiff nonetheless asserts that no irregularity existed because, after being properly instructed to resume deliberations following the inconsistent interrogatory responses and verdict, the jury ultimately rendered a verdict for plaintiff consistent with its answers to the interrogatories. Plaintiff's attempts to minimize the obvious problems with the jury interrogatories are not persuasive.

{¶ 30} The purpose of jury interrogatories is twofold. *Hamm v. Smith* (Dec. 18, 1998), 6th Dist. No. E–98–026, 1998 WL 879191. "The essential purpose to be served by [jury] interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.* (1986), 28 Ohio St.3d 333, 336–337, 28 OBR 400, 504 N.E.2d 415, citing *Davison v. Flowers* (1930), 123 Ohio St. 89, 174 N.E. 137. Jury interrogatories also test the jury's factual determinations and express the jury's true intentions. *Hamm*, citing *Phillips v. Dayton Power & Light Co.* (1996), 111 Ohio App.3d 433, 676 N.E.2d 565. The Supreme Court of Ohio stated that "the answering of [jury] interrogatories is even more important than the general verdict." *Aetna Cas. & Sur. Co. v. Niemiec* (1961), 172 Ohio St. 53, 55, 15 O.O.2d 94, 173 N.E.2d 118.

{¶ 31} In this case, the magistrate was present during the trial and was in a better position than this court to assess the jury's flaws in answering the interrogatories. The progress of the deliberations allowed the magistrate reasonably to conclude that the jury had tailored the third response to the proximate-cause interrogatory in an effort to award damages to plaintiff, despite not being convinced that plaintiff had proved by a preponderance of the evidence that Dr. Healy was the proximate cause of plaintiff's injuries. Indeed, as the magistrate noted, the jury twice responded negatively to the interrogatory about proximate cause and responded affirmatively only after the magistrate explained that the jury could not award damages without finding proximate cause. Even its finding that Dr. Healy was negligent was premised on a fluid rationale.

{¶ 32} Under the unique circumstances of this case, we cannot conclude that the trial court abused its discretion in determining, based upon the irregularities apparent in the jury proceedings, not only that defendants did not receive a fair trial but that a new trial on all issues was warranted.

B. Manifest Weight of the Evidence

{¶ 33} Plaintiff also takes issue with the trial court's decision to grant a new trial on grounds that the jury's verdict was against the manifest weight of the

evidence. Civ.R. 59(A)(6) provides that the trial court may grant a new trial to all or any of the parties and on all or part of the issues based upon a finding that "[t]he judgment is not sustained by the weight of the evidence." Because the trial court properly granted a new trial under Civ.R. 59(A)(1), plaintiff's first, second, and third assignments of error are rendered moot in challenging the trial court's decision to grant a new trial under Civ.R. 59(A)(6).

## C. Noneconomic Damages Only

{¶ 34} Lastly, plaintiff seeks a new trial solely on noneconomic damages. A new trial on damages alone is usually granted only when liability is not contested. *Iames v. Murphy* (1995), 106 Ohio App.3d 627, 633, 666 N.E.2d 1147. When a new trial is granted, it generally should encompass all issues that come into doubt under the tainted verdict. Id. In this case, the trial court's determination to grant a new trial on all issues due to the irregularities in the jury proceedings was proper, and that trial will encompass issues related to both economic and noneconomic damages, rendering moot plaintiff's contentions about noneconomic damages under her third assignment of error.

{¶ 35} Because the trial court did not abuse its discretion in granting defendants' motion for a new trial on all issues pursuant to Civ.R. 59(A)(1), we overrule plaintiff's first, second, and third assignments of error as indicated.

## IV. Fourth Assignment of Error—Directed Verdict for Maden

{¶ 36} Plaintiff's fourth assignment of error contends that the trial court erred in directing a verdict in favor of Maden.

{¶ 37} When considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is directed. Civ.R. 50(A). A motion for a directed verdict raises questions of law, not factual issues, because it tests whether the evidence is legally sufficient to allow the case to be presented to the jury for deliberation. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.* (1998), 81 Ohio St.3d 677, 679–680, 693 N.E.2d 271; *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252. The court's disposition of the motion thus does not involve weighing the evidence or the credibility of the witnesses. *Texler* at 679–680. The court must deny the motion where any evidence of substantial probative value favors the nonmoving party and reasonable minds might reach different conclusions on that evidence. Id.; *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 423 N.E.2d 467. Because a directed verdict tests only the sufficiency of the evidence, it presents a question of law that appellate courts review de novo. *Jarupan v. Hanna,* 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66, ¶ 8, citing *Groob v. KeyBank,* 108 Ohio St.3d 348, 2006-

Ohio-1189, 843 N.E.2d 1170, ¶ 14, and *Goodyear Tire & Rubber Co. v. Aetna Cas. & Surety Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

[13–15] {¶ 38} To establish a cause of action for medical malpractice, the plaintiff " 'must show the existence of a standard of care within the medical community, breach of that standard of care by the defendant, and proximate cause between the medical negligence and the injury sustained.' " *Deer v. River Valley Health Sys.* (Jan. 3, 2001), 4th Dist. No. 00CA20, 2001 WL 243492, quoting *Taylor v. McCullough–Hyde Mem. Hosp.* (1996), 116 Ohio App.3d 595, 599, 688 N.E.2d 1078. Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 130–131, 75 O.O.2d 184, 346 N.E.2d 673. Failure to establish the standard of care is fatal to a prima facie case of medical malpractice. Id. at 130.

{¶ 39} In granting Maden's motion for directed verdict, the magistrate determined that plaintiff did not demonstrate that Maden had breached the standard of care applicable to physician assistants in the same or similar circumstances. The magistrate noted, "There is no evidence that a standard of care for a physician's assistant would have required [Maden] to do anything differently than she did." The magistrate thus concluded as a matter of law that Maden was not negligent and dismissed plaintiff's claim against her.

{¶ 40} Plaintiff on appeal argues that no separate and distinct standard of care applies to a physician assistant; rather, the same standard of care applies to all medical personnel who examine, test, diagnose, and treat a patient. Plaintiff contends that she presented evidence that Dr. Healy and Maden had worked as a team, and as a team, their medical care did not meet the applicable standard of care.

{¶ 41} A "physician assistant" is a "skilled person qualified by academic and clinical training to provide services to patients as a physician assistant under the supervision, control, and direction of one or more physicians who are responsible for the physician assistant's performance." R.C. 4730.01(A); see also Ohio Adm.Code 4730–1–02(A); R.C. 4730.02 ("No person shall practice as a physician assistant without the supervision, control, and direction of a physician"). In addition, R.C. 4730.22(A) states, "A physician assistant's supervising physician assumes legal liability for the services provided by the physician assistant." See also Ohio Adm.Code 4730–1–03(A) ("The physician supervising a physician assistant assumes legal liability for the services provided by the physician assistant under a board-approved supervision agreement").

{¶ 42} The General Assembly thus determined that a physician assistant may provide services only under the supervision, control, and direction of a physician

who assumes legal liability for the provision of such services, suggesting that the legislature did not intend physician assistants be held to the same standard of care as physicians in administering medical care. Instead, a physician assistant must be held to the recognized standard of acceptable professional practice in the profession of physician assistants, not a standard applied to physicians. To establish that a physician assistant committed medical malpractice, the plaintiff must adduce testimony from an expert who is qualified to testify to (1) the standard of care applicable to physician assistants and (2) whether the physician assistant in question exercised the reasonable degree of skill and experience others in that profession ordinarily possess.

{¶ 43} Plaintiff's sole expert, Dr. Donald M. Yealy, chairman of the Department of Emergency Medicine at the University of Pittsburgh Medical Center, did not differentiate between the standards of care applicable to Dr. Healy and Maden and did not specifically opine regarding the standard of care applicable to physician assistants. Rather, Dr. Yealy repeatedly opined that both Dr. Healy and Maden had breached the standard of care applicable to a reasonable emergency-department *physician*. Plaintiff's failure to establish the standard of care applicable to a physician assistant is fatal to her medical-malpractice claim against Maden.

{¶ 44} Moreover, Maden testified that as a physician assistant, she works under the direct supervision of a physician, who in this case was Dr. Healy. Maden acknowledged that she and Dr. Healy discussed plaintiff's condition and arrived at a course of treatment, but she testified that Dr. Healy had made all final decisions. Dr. Healy testified similarly, stating she was the final arbiter of plaintiff's diagnosis and disposition and that Maden had had no decision-making role in treating plaintiff. Dr. Yealy testified that his review of St. Ann's medical records pertaining to plaintiff's treatment convinced him that Dr. Healy and Maden had shared the decision-making role in treating plaintiff, but he admitted that he did not know which of the two had ultimately decided on plaintiff's treatment. He further acknowledged that Dr. Healy and Maden had different decision-making power, and he had no basis to dispute Dr. Healy's testimony that she rendered all the decisions regarding plaintiff's care.

{¶ 45} Because plaintiff failed to establish the standard of care applicable to physician assistants and failed to adduce evidence to support her claim against Maden, the trial court properly directed a verdict for Maden and dismissed her from plaintiff's lawsuit. Plaintiff's fourth assignment of error is overruled.

## V. First Assignment of Error on Cross–Appeal—Judgment Notwithstanding the Verdict

{¶ 46} Defendants' first assignment of error contends that the trial court erred in denying their motion for judgment notwithstanding the verdict

("JNOV"). Defendants argue that upon the evidence presented at trial, reasonable minds could only conclude that even if Dr. Healy had breached the standard of care, the breach did not proximately cause harm to plaintiff. In reviewing a decision denying a motion for JNOV, an appellate court applies the same test used in reviewing a motion for a directed verdict. *Texler*, 81 Ohio St.3d at 679–680, 693 N.E.2d 271.

{¶ 47} At trial, Dr. Yealy, plaintiff's expert, noted that patients with artificial heart valves are particularly susceptible to blood clots forming around the valve and, as a result, are prescribed a medication such as Coumadin to thin the blood and curtail the formation of blood clots. Dr. Yealy observed that plaintiff had an artificial heart valve and was prescribed Coumadin, but failed to take it for approximately one year.

{¶ 48} Dr. Yealy identified two types of stroke: (1) hemorraghic, caused by bleeding in the brain, and (2) ischemic, caused by blockage of an artery in the brain. He opined that plaintiff presented at St. Ann's emergency department with an acute cardioembolic ischemic stroke. According to Dr. Yealy, a blood clot detached from plaintiff's artificial heart valve and traveled from the heart to the posterior circulation and into the brainstem, causing blockage and the stroke. Dr. Yealy further opined that one or more blood clots traveling an identical path from the artificial heart valve to the same area of the brainstem had caused plaintiff at least one additional stroke the next day.

{¶ 49} In Dr. Yealy's expert opinion, Dr. Healy breached the standard of care applicable to emergency-department physicians in the same or similar circumstances when she failed to diagnose and treat the initial stroke, to consult a neurologist to discuss potential treatment options, and to administer the blood-thinning medication heparin. According to Dr. Yealy, administering heparin would have prevented additional clots that led to the additional stroke(s) causing plaintiff's permanent injuries. Dr. Yealy based his opinion on his medical training, his review of medical literature pertaining to stroke, and his significant years of personal experience as an emergency-department physician specializing in the diagnosis and treatment of stroke.

{¶ 50} Defendants' cross-examination particularly challenged Dr. Yealy's two-clot and two-stroke theory, suggesting that one clot had caused one stroke that then evolved over time to produce the additional symptoms that plaintiff experienced the next day. Dr. Yealy disagreed with defendants' hypothesis, noting that plaintiff's additional symptoms were distinctly different from those she experienced the previous day and were not the result of the initial stroke. Although Dr. Yealy acknowledged the minimal probability that two blood clots had traveled an identical pathway and resulted in blockage in the same area of the brainstem, he opined that it was not impossible.

{¶ 51} Defendants also challenged Dr. Yealy's opinion that Dr. Healy was negligent in failing to administer heparin to prevent the additional clots from forming. Although Dr. Healy cited numerous medical studies contradicting Dr. Yealy's opinion on the effectiveness of heparin in treating acute cardioembolic stroke patients, Dr. Yealy testified that the studies were too broad to be particularly relevant to the specifics of plaintiff's case. According to Dr. Yealy, plaintiff differed from the types of patients involved in the studies, and his clinical experience dictated the use of heparin as effective in preventing plaintiff's subsequent stroke(s). He added that constructing a clinical trial to address the circumstances relevant to plaintiff's situation would be difficult.

{¶ 52} Three medical experts testified for defendants. The first, Dr. Guy Rordorf, a neurologist at Massachusetts General Hospital, told the jury that plaintiff presented to St. Ann's with an acute cardioembolic stroke. According to Dr. Rordorf, one small blood clot caused this single stroke that evolved over time, causing the additional neurological deficits manifested the next day. Dr. Rordorf opined that Dr. Healy did not fall below the applicable standard of care in failing to diagnose plaintiff's stroke based upon the symptoms plaintiff displayed at the time she presented at St. Ann's. He further opined that even had Dr. Healy diagnosed the stroke or consulted a neurologist, no treatment, including the administration of heparin, would have improved plaintiff's condition.

{¶ 53} According to Dr. Rordorf, heparin aids in preventing the formation of new clots but is not effective in preventing an evolving stroke from worsening. To support his opinion, Dr. Rordorf cited numerous medical studies, journals, and guidelines that state that no evidence indicates that heparin benefits an acute stroke, and heparin was not recommended for improving neurological outcome or preventing worsening of an evolving stroke. On cross-examination, Dr. Rordorf acknowledged that medical trial results are applicable to individual patients only when those patients have the same major characteristics as the patients in the trials, and he conceded that plaintiff's symptomology was not identical to that of any of the patients in the cited medical trials.

{¶ 54} Defendants' second medical expert, Dr. Richard S. Krause, an emergency-room physician at Buffalo General Hospital, opined that Dr. Healy was not negligent in failing to diagnose plaintiff's stroke, because plaintiff had presented with no neurological deficits other than pupil-sparing third-cranial-nerve palsy. He also opined that not only would plaintiff's condition not have improved had Dr. Healy diagnosed the stroke but her decision to consult an ophthalmologist rather than a neurologist was reasonable under the circumstances.

{¶ 55} Dr. Krause further testified that Dr. Healy was not negligent in failing to administer heparin, as pertinent medical literature suggested that heparin provided no benefit in an acute cardioembolic stroke and could even cause harm

by increasing the risk of a hemorrhagic stroke. He also disagreed with Dr. Yealy's suggestion the cited medical trials were irrelevant because plaintiff's symptomology was different from that of the patients in the trials. In support, he noted that physicians practice "evidence-based medicine" involving analysis of large trials dealing with thousands of patients. On cross-examination, Dr. Krause acknowledged that none of the medical studies pertaining to the benign or harmful effects of heparin involved patients with symptoms identical to those that plaintiff experienced.

{¶ 56} Defendants' final medical expert, Dr. Arthur Pancioli, professor of Clinical Research in Emergency Medicine at the University of Cincinnati, testified that he had never seen a stroke patient present with plaintiff's symptomology and therefore would not expect Dr. Healy, a general emergency-department physician, to suspect that plaintiff was having a stroke. Accordingly, he opined that Dr. Healy was not negligent in failing to diagnose plaintiff's stroke or in failing to consult a neurologist.

{¶ 57} He disagreed with Dr. Yealy's theory that plaintiff had had a second stroke caused by a second blood clot traveling the same pathway from the heart and lodging in the same area of the brainstem. He stated the odds of such happening were "astronomically low." Dr. Pancioli opined that one blood clot traveled from plaintiff's heart to her brainstem that momentarily affected her eye function, and the stroke symptoms evolved to create additional neurological deficits over the next 24 to 48 hours. He further testified that Dr. Healy was not negligent in failing to administer heparin, as multiple medical research trials concluded that heparin was not effective, and was otherwise not recommended, in treating acute cardioembolic strokes.

{¶ 58} Plaintiff's and defendants' medical experts disagreed on the number of strokes that the plaintiff had suffered and whether the failure to administer heparin was the cause of plaintiff's injuries, placing the issue squarely before the jury in determining which experts and which theories were most credible. For that reason, the trial court wrongly granted a new trial under Civ.R. 59(A)(6). For the same reason, when that evidence is construed in plaintiff's favor, the trial court properly denied defendants' motion for JNOV, as plaintiff presented evidence of substantial probative value that could cause reasonable minds to reach different conclusions on the evidence. Defendants' first assignment of error on cross-appeal is overruled.

## VI. Second and Third Assignments of Error on Cross–Appeal—Affirmative Defenses

{¶ 59} Defendants' second and third assignments of error are interrelated and thus will be considered together. The second assignment of error asserts that

the trial court erred in denying defendants' motion for partial summary judgment on their affirmative defenses of assumption of the risk and contributory negligence. The third assignment of error avers that the magistrate erred in refusing to admit evidence that plaintiff had assumed the risk and was contributorily negligent.

{¶ 60} Defendants asserted in their motion for partial summary judgment that because plaintiff had failed to consistently take her prescription Coumadin after her heart-valve-replacement surgery in 1994, she assumed the risk of the stroke she suffered on December 13, 2005, or at least was contributorily negligent in causing the stroke. In her motion in limine, plaintiff argued that defendants should be precluded from presenting evidence or argument on the affirmative defenses at trial. Decisions rendered on the motions determined that the defendants could not assert the affirmative defenses at trial.

{¶ 61} Prior to opening statements, the magistrate declined defendants' invitation to reconsider the pretrial rulings. Defendants nonetheless in opening statement asserted that plaintiff's failure to take her prescription Coumadin caused her stroke. Following plaintiff's objection and brief argument, the magistrate stated that "[t]he issue of assumption of risk and contributory negligence is not going to be an issue [the jury] will consider."

{¶ 62} At the close of the evidence, the magistrate rejected defendants' argument that both assumption of the risk and contributory negligence should be included in the jury instructions, jury interrogatories, and verdict forms. Indeed, in his charge to the jury, the magistrate stated, "You have heard evidence that the plaintiff may have caused her own medical condition by her * * * failing to take the drug Coumadin. The fact that the plaintiff may have caused or contributed to her medical condition by * * * not taking Coumadin before coming under the care of the defendant is not relevant and shall not be considered by you on the issue of defendant's negligence."

{¶ 63} Even though the case was tried, defendants challenge the trial court's decision to deny their motion for partial summary judgment. Defendants further contend that they should be permitted to present evidence regarding the affirmative defenses of assumption of the risk and contributory negligence at the new trial, and the trial court should be directed to provide jury instructions, interrogatories, and verdict forms consistent with those defenses.

{¶ 64} Generally, "[a]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d

150, 642 N.E.2d 615, syllabus. The rule prevents the fundamental unfairness of overturning a fully litigated verdict in favor of a judgment rendered in a summary proceeding based upon a curtailed presentation of evidence. Id. at 156. Because *"Continental Ins. Co.* does not automatically apply to all situations involving post-trial review of the denial of summary judgment," a decision denying summary judgment may be reviewed and reversed on matters of law, even if a verdict subsequently was rendered pursuant to trial. *Chieffo v. YSD Industries, Inc.*, 157 Ohio App.3d 182, 2004-Ohio-2481, 809 N.E.2d 1186, ¶ 8. An interlocutory denial of summary judgment may also be reviewed and reversed on appeal if the issues involved at the summary judgment stage were not actually litigated at trial.

{¶ 65} In the end, whether to "apply *Continental Ins. Co.* depends in large part on the questions and issues that an appellant raises on appeal." Id. Because defendants' affirmative defenses of assumption of the risk and contributory negligence were not actually litigated at trial, and because defendants seek to litigate them at the new trial, we address the trial court's interlocutory denial of defendants' motion for partial summary judgment.

A.   Assumption of the Risk

{¶ 66} Ohio law recognizes three categories of assumption of the risk: express, primary, and implied. *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, ¶ 10, citing *Ballinger v. Leaniz Roofing, Ltd.*, 10th Dist. No. 07AP–696, 2008-Ohio-1421, 2008 WL 802722, ¶ 6. Express assumption of the risk applies when parties expressly agree to release liability. *Crace* at ¶ 11, citing *Ballinger* at ¶ 7;  see also *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 114, 6 OBR 170, 451 N.E.2d 780 ("Express assumption of risk would arise where a person expressly contracts with another not to sue for any future injuries which may be caused by that person's negligence").  Primary assumption of risk " 'is really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action.' " *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 431, 659 N.E.2d 1232, citing Prosser & Keeton, Law of Torts (5th Ed.1984) 496–497, Section 68;  see also *Anderson* at 114 (primary assumption of risk "concerns cases where there is a lack of duty owed by the defendant to the plaintiff").  Implied assumption of the risk, also known as secondary assumption of the risk, "is defined as a plaintiff's consent to or acquiescence in an appreciated, known, or obvious risk to plaintiff's safety." *Wolfe v. Bison Baseball, Inc.*, 10th Dist. No. 09AP–905, 2010-Ohio-1390, 2010 WL 1254597, ¶ 19.  "Implied assumption of risk does not relieve a defendant of his duty to the plaintiff." Id., citing *Collier v. Northland Swim Club* (1987), 35 Ohio App.3d 35, 518 N.E.2d 1226, paragraph two of the syllabus.

{¶ 67} Defendants in their answer to plaintiff's amended complaint and in their motion for partial summary judgment raised a generic claim of assumption of the risk as an affirmative defense, but did not disclose whether they intended to rely on primary assumption of the risk, implied assumption of the risk, or possibly both, express assumption of the risk being inapplicable. Accordingly, we address both.

{¶ 68} Primary assumption of the risk occurs where the defendant owes no duty to the plaintiff. Although plaintiff admitted that she had failed to take her Coumadin for an extended period and knew she risked a stroke or even death by doing so, such behavior does not automatically relieve a physician from any duty to render appropriate medical treatment and from liability for rendering substandard medical care. An emergency-department physician has a duty to properly treat all patients in his or her care, including those who suffer from a medical condition the patient may have caused. To conclude that a physician does not have such a duty is against public policy and renders meaningless a physician's obligations to treat his or her patients. Accordingly, primary assumption of the risk is not available under the circumstances of this case.

{¶ 69} Similarly, implied assumption of the risk is not available as a defense under the circumstances of this case. In instances of implied assumption of the risk, the plaintiff consents to or acquiesces in an appreciated, known, or obvious risk to his or her safety. In this case, the risk plaintiff allegedly and voluntarily assumed was that upon presenting herself to St. Ann's emergency department for medical assistance, Dr. Healy would fail to properly diagnose and treat her evolving stroke. No evidence in the record suggests that plaintiff knew or should have known that Dr. Healy would render substandard medical care or that plaintiff consented to or acquiesced in the risk of receiving substandard medical care.

B. Contributory Negligence

{¶ 70} In *Lambert v. Shearer* (1992), 84 Ohio App.3d 266, 616 N.E.2d 965, this court recognized the defense of contributory negligence in medical-malpractice cases and acknowledged that the defense, if proven, may serve to diminish recovery under comparative-negligence principles. Id. at 284, citing *Bird v. Pritchard* (1973), 33 Ohio App.2d 31, 62 O.O.2d 96, 291 N.E.2d 769. "To prove the affirmative defense of contributory negligence, the defendant must prove that the plaintiff breached a duty, proximately causing her own injury. Thus, the plaintiff's own 'want of ordinary care * * * [must have] combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred.'" *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.,*

182 Ohio App.3d 768, 2009-Ohio-2460, 915 N.E.2d 361, ¶ 61, quoting *Brinkmoeller v. Wilson* (1975), 41 Ohio St.2d 223, 226, 70 O.O.2d 424, 325 N.E.2d 233.

{¶ 71} *Lambert* held that a patient's contributory negligence "must be contemporaneous with the malpractice of the physician." 84 Ohio App.3d at 284, 616 N.E.2d 965. In other words, the alleged negligence of the patient prior to coming under the care of the defendant physician does not constitute negligence contributing to the injury sustained as a result of the physician's negligence. Accordingly, "it is improper to suggest * * * that the negligent conduct of the patient prior to coming under the care of the defendant physician could serve to constitute [contributory patient] negligence." Id. "Sick people deserve the same care whether they smoke, drink, drive too fast, or engage in socially unacceptable behavior." Id.

{¶ 72} Other jurisdictions similarly have refused to allow contributory-negligence defenses in cases where a patient negligently created the need for treatment. In *Matthews v. Williford* (Fla.App.1975), 318 So.2d 480, the plaintiff's decedent suffered a heart attack, and his physician advised him to stop smoking and monitor his weight. Ten years later, the plaintiff's decedent had a second heart attack, was admitted to the hospital under the defendant physician's care, and died several hours later from a massive myocardial infarction. In the wrongful-death action against the physician, the plaintiff claimed that the physician had negligently failed to take medical precautions to prevent the fatal heart attack. At trial, the court refused the physician's request for an instruction on contributory negligence based upon the decedent's earlier conduct in failing to heed the advice of his physician to quit smoking and maintain his weight. The jury ultimately rendered a verdict for the plaintiff.

{¶ 73} The Supreme Court of Florida affirmed the verdict, noting well-settled Florida law that "a remote condition or conduct which furnishes only the occasion for someoneelse's [sic] supervening negligence is not a proximate cause of the result of the subsequent negligence." Id. at 481. The court held that "conduct prior to an injury or death is not legally significant in an action for damages like this, unless it is a legal or proximate cause of the injury or death" rather than "a cause of the remote conditions or occasion for the later negligence. So it is with conduct of a patient which may have contributed to his illness or medical condition," a condition that "furnishes the occasion for medical treatment. That conduct simply is not available as a defense to malpractice which causes a distinct subsequent injury—here, the ultimate injury, wrongful death." Id. at 483.

{¶ 74} Similarly, in *Harding v. Deiss* (2000), 300 Mont. 312, 3 P.3d 1286, the deceased patient suffered from asthma, was allergic to horses, and had a history of breathing problems. During a horseback ride, the patient experienced difficulty breathing and collapsed. She was transported to a hospital, where the

defendants treated her. The patient died several days later of an irreversible brain injury that an acute asthma attack had caused. In the wrongful-death action against the physicians, the plaintiff argued that the physicians had been negligent in failing to intubate the patient immediately upon her arrival at the hospital. The defendants claimed that the patient had already suffered a severe brain injury due to oxygen deprivation brought on by her asthma attack and it was her own negligence that caused her death.

{¶ 75} The Supreme Court of Montana concluded that "comparative negligence as a defense does not apply where a patient's pre-treatment behavior merely furnishes the need for care and treatment which later becomes the subject of a malpractice claim." Id. at 1289. The patient's conduct "before seeking medical treatment is merely a factor the physician should consider in treating the patient. [The patient's] actions are clearly pre-treatment conduct and as such are not to be considered as evidence of fault which may offset any negligent conduct by the [defendant physicians]." Id. To accept defendant's argument that the asthmatic patient's riding a horse was a negligent act that should be offset against the defendant's negligence, the court reasoned, "would lead to an absurd result. Under such a theory, in any case where the patient was responsible for events that led to her hospitalization, the treating physician would not be liable for negligent treatment." Id.

{¶ 76} The court thus held that "in medical malpractice actions, jury instructions on a patient's comparative negligence are appropriate only where the patient's negligent conduct occurs contemporaneous with or subsequent to treatment." Id. See also *Jensen v. Archbishop Bergan Mercy Hosp.* (1990), 236 Neb. 1, 459 N.W.2d 178 (the defense of contributory negligence is inapplicable "when a patient's conduct provides the occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care, or treatment on which a subsequent medical malpractice claim is based"); Id. at 15; *Eiss v. Lillis* (1987), 233 Va. 545, 357 S.E.2d 539 (contributory negligence was not available as a defense because the patient's conduct occurred before rather than contemporaneously with the physician's treatment).

{¶ 77} Plaintiff did not materially misrepresent or fail to disclose a condition critical to Dr. Healy's diagnosis. To the contrary, plaintiff truthfully disclosed that she had an artificial heart valve, that she was required to take Coumadin for the rest of her life, and that she had not consistently taken her medication. Nonetheless, plaintiff's failure to heed the medical advice of her physicians after her 1994 valve-replacement surgery does not constitute contributory negligence as to Dr. Healy's treatment. Any failure on plaintiff's part to

follow the medical advice of other physicians could not have " 'combined and concurred' " with Dr. Healy's negligence to proximately cause plaintiff's injuries. *Segedy*, 182 Ohio App.3d 768, 2009-Ohio-2460, 915 N.E.2d 361, at ¶ 64, quoting *Brinkmoeller*, 41 Ohio St.2d at 226, 70 O.O.2d 424, 325 N.E.2d 233. Dr. Healy agreed to undertake the care and treatment of plaintiff as she found her on December 13, 2005. See *Lambert*, 84 Ohio App.3d at 284, 616 N.E.2d 965.

{¶ 78} The record presents no reason to depart from the standards outlined in *Lambert* and other jurisdictions. The alleged negligence of plaintiff was not "contemporaneous" with the alleged medical negligence of Dr. Healy. Plaintiff presented to Dr. Healy in the midst of a medical crisis, and Dr. Healy had the duty to provide reasonable medical care under those circumstances. Dr. Healy cannot avoid responsibility for any alleged failure to fulfill that duty by claiming that plaintiff's prior negligence caused or contributed to the condition requiring treatment of plaintiff. As a matter of law, any alleged negligence of plaintiff that may have contributed to her condition bringing her to Dr. Healy for treatment does not constitute a basis for a defense of contributory negligence.

{¶ 79} Because defendants' asserted affirmative defenses of assumption of the risk and contributory negligence are not available to defendants under the circumstances of this case, the trial court properly denied defendants' motion for partial summary judgment and granted, through its magistrate, plaintiff's motion in limine. Accordingly, at the new trial, defendants may not pursue the affirmative defenses of assumption of the risk and contributory negligence. Defendants' second and third assignments of error on cross-appeal are overruled.

{¶ 80} For the foregoing reasons, plaintiff's first, second, third, and fourth assignments of error are overruled as indicated, and defendants' three assignments of error on cross-appeal are overruled. The judgment of the Franklin County Court of Common Pleas denying plaintiff's motion for a new trial on noneconomic damages only, granting defendants' motion for a new trial on all issues, granting Maden's motion for a directed verdict, denying defendants' motion for partial summary judgment, and granting plaintiff's motion in limine is affirmed.

Judgment affirmed.

FRENCH and CONNOR, JJ., concur.