[Cite as *Thomas v. Dept. of Rehab. & Corr.*, 2016-Ohio-3476.]

| | |
|---|---|
| LAWRENCE THOMAS | Case No. 2014-00731 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, brought this action raising various allegations against both the Department of Rehabilitation and Correction and the Correctional Institution Inspection Committee. On March 17, 2015, the court dismissed all claims against the Correctional Institution Inspection Committee as well as a portion of the claims against the Department of Rehabilitation and Correction, hereinafter "defendant." On December 8, 2015, the case came on for trial on plaintiff's remaining claims, which consist of claims for assault, battery, or negligence arising from the alleged excessive use of force by corrections officers against plaintiff on August 19, 2014, as well as a claim of negligence arising from the medical care and treatment associated with the injuries that plaintiff allegedly sustained from the use of force.

{¶2} At trial, plaintiff testified that on the morning on August 19, 2014, while performing a work assignment in the kitchen of the Chillicothe Correctional Institution (CCI), he became involved in a dispute with a corrections officer. Plaintiff admitted that he struck the officer in her face (which resulted in a felony assault conviction on top of his preexisting murder and robbery convictions), and that he was then forcibly restrained by an Aramark food service worker until corrections officers responded to the scene, placed him in restraints, and escorted him away. Plaintiff testified that he was

placed in a cage and remained there for most of the morning. Plaintiff testified that at approximately 10:00 a.m. he gave a written statement as requested by someone at CCI (Defendant's Exhibit 1) and he also recalled seeing an Ohio State Highway Patrol trooper at some point that morning.

{¶3} Plaintiff testified that around 1:00 p.m., he was escorted to the "dress out room" in Post 5, where inmates are taken to prepare for being transported outside the institution. According to plaintiff, once he got there three male officers wearing black uniforms beat him continuously for 25 to 30 minutes in a location where there was no security camera. Plaintiff stated that when they finished, they put him in the clothing and restraints used for transports, they beat him for a couple more minutes, and then they escorted him to a van bound for the Southern Ohio Correctional Facility (SOCF).

{¶4} Plaintiff related that upon arriving at SOCF, he waited in the van for about 45 minutes before being escorted inside the compound, where the same officers who assaulted him at CCI assaulted him once more, this time for about five minutes. Plaintiff stated that one of the officers twisted his handcuffs and forced him to the ground during this assault, and according to plaintiff one of his hands was injured so badly by the twisting of the handcuffs that it swelled up to the size of a baseball mitt. Plaintiff testified that the officers stopped assaulting him upon being informed by a Lieutenant Frazier from SOCF that there were cameras in the area. According to plaintiff, he remained in a reception area inside SOCF for over an hour and then was escorted to the medical department, where he was seen by a nurse. Plaintiff testified that when he told the nurse he had been beaten and that his ribs and hand were injured, a lieutenant who was accompanying him told the nurse to disregard everything plaintiff said and told plaintiff to suffer through it.

{¶5} Plaintiff stated that after seeing the nurse, and about two hours in total after his arrival at SOCF, he was escorted by corrections officers toward the J-1 housing unit, but as they walked down a ramp on the way there, a supervisor standing in a doorway

ahead stated to the officers: "okay, don't hit him in the head and don't hit him in the face." Plaintiff testified that four corrections officers proceeded to beat him for about 15 minutes, until the supervisor told them to stop. As far as identifying any of the officers, plaintiff testified that although in his deposition he identified a Corrections Officer Neff or Nerf as one of those involved, he now thinks that this was incorrect, but he believes one of the officers involved was named Burt or Burton.

{¶6} Plaintiff testified that he remained in significant pain in the days that followed, and on August 24, 2014, with assistance from another inmate, he submitted a Health Services Request form to seek medical attention for his ribs and wrist. (Plaintiff's Exhibit A.) Plaintiff stated that he did not receive a response, so he submitted a second Health Services Request form on August 29, 2014. (Plaintiff's Exhibit B.) Plaintiff also initiated this lawsuit on August 29, 2014. Plaintiff testified that he also submitted a kite (a handwritten form of institutional correspondence) to the mental health department on September 10, 2014. (Plaintiff's Exhibit C.)

{¶7} According to plaintiff, he remained in his cell for the next three weeks without receiving any kind of medical attention until a nurse saw him on September 9, 2014. Plaintiff testified that on September 15, 2014, he saw a physician at SOCF, Dr. Ahmed. Plaintiff recounted that Dr. Ahmed told him that his ribs were "messed up" and were prone to further injury, but plaintiff stated that Ahmed was called out for a moment to speak with a nurse, and when Ahmed came back his attitude seemed different and he made a point of saying that he did not know how plaintiff came to be injured. Plaintiff stated that Dr. Ahmed gave him some aspirin or other medication which was not effective for relieving his pain. Plaintiff also stated that he felt that his hand should have been put in a cast, but that Dr. Ahmed declined to do so. According to plaintiff, Dr. Ahmed did arrange for x-rays that were performed on September 20, 2014. Plaintiff testified that he learned of the results of the x-rays around September 30, 2014, and that around that time Dr. Ahmed prescribed a different pain medication. Plaintiff

testified, however, that he still has pain today in his ribs and that his hand never healed properly.

{¶8} Plaintiff testified that he recalled speaking with someone at SOCF regarding an investigation that arose from one or more complaints that he filed about the events of August 19, 2014. Plaintiff stated that in the course of the investigation, on September 17, 2014, a corrections officer came and escorted him to see a nurse, and on the way the officer made threatening remarks to him. According to plaintiff, the nurse had little interest in assessing him and spent most of the time conversing with the officer, and after about 20 minutes he told the nurse that if she was not going to evaluate him, then he wanted to leave. To the extent that a Medical Exam Report which appears to correspond to this evaluation includes a finding by the nurse that plaintiff had "scars on ankles of indeterminate age," plaintiff testified that he sustained these wounds on August 19, 2014. (Defendant's Exhibit 6.)

{¶9} Plaintiff testified that when he received a response to his complaints, apparently referring to a Disposition of Grievance issued by the Inspector of Institutional Services at SOCF (Defendant's Exhibit 9), there were inaccuracies that he feels were designed to cover up the truth. Plaintiff explained, for example, that whereas Lieutenant Bauer was identified as having been involved in escorting him to the J-1 housing unit on August 19, 2014, this was not true. Plaintiff stated that other documentation about the incident, such as a Medical Exam Report that on its face corresponds to the examination he underwent when he arrived at SOCF on August 19, 2014, is also false and was written in an effort to cover up the truth. (Defendant's Exhibit 4.) According to plaintiff, this Medical Exam Report falsely says that he had no injuries and that he told the nurse he did not need to be assessed, and whereas it was signed by a Nurse Reiter (whom plaintiff at times in his testimony referred to as Nurse Rita), he was actually seen by a different nurse that day.

{¶10} Jessica McQuate, R.N. testified that she is employed with defendant at CCI as a "Nurse 1." McQuate explained that, among other duties, she is responsible for examining staff and inmates and checking for injuries when they have been involved in a use of force incident. McQuate stated that, as a result of the force used upon plaintiff by the food service worker in the kitchen at CCI on the morning of August 19, 2014, she examined plaintiff at 9:40 a.m. and prepared a corresponding Medical Exam Report. (Defendant's Exhibit 2.) McQuate stated that she remembers seeing plaintiff that morning, and, as she documented in the Medical Exam Report, he showed no sign of injury.

{¶11} Lieutenant Brandon Collier testified that he is employed with defendant at CCI. Collier testified that he responded to a call for assistance in the kitchen that went out after plaintiff struck the corrections officer there, and he stated that by the time he arrived the situation had basically concluded. Collier stated that among his duties, he serves as an assistant investigator at CCI, and he stated that he was involved with the investigation into the use of force by the food service worker who restrained plaintiff. Collier explained that any time force is used on an inmate, the incident is supposed to be reviewed to establish what force was used and why it occurred. According to Collier, in the course of the investigation plaintiff was brought to the correctional captain's office later that morning, and while there plaintiff gave a written statement pertaining to the incident. (Defendant's Exhibit 1.) Collier testified that he did not observe anyone threaten plaintiff while he was in the captain's office.

{¶12} Lieutenant James Ball testified that he is employed with defendant at CCI. Ball testified that, in addition to supervising corrections officers and assisting the correctional captain, he is involved in defendant's Special Tactics and Response (STAR) Team, which is called upon from time to time to perform specialized operations such as responding to crisis situations and transporting higher security inmates, including those on death row or those who have been involved in a major assault. Ball

stated that on August 19, 2014, he was assigned to carry out a STAR Team transport of plaintiff from CCI to SOCF. Ball recalled going to an area at CCI known as Post 5 and observing plaintiff confined in a space referred to as the bullpen. Ball stated that plaintiff was then taken to the "dress out" area where he put on transport attire and was placed in handcuffs and other restraints, and he was then escorted to the van. As Ball described, those involved with transporting plaintiff were himself and Corrections Officers Mike Clemmons and Robert Horton. According to Ball, he observed Clemmons and Horton perform the dress out process and he never saw them or anyone else use force upon plaintiff at any time that day.

{¶13} Ball testified that he rode in the van with plaintiff, Clemmons, and Horton, and he recalled that when they arrived at SOCF plaintiff seemed to be well both physically and mentally. Ball recalled having a normal conversation with plaintiff in the van as they pulled up to SOCF. Ball stated that the van was backed into the receiving and departure area and plaintiff was turned over to SOCF personnel. Ball recounted that there was nothing exceptional about the transport procedure at all.

{¶14} Corrections Officer Mike Clemmons testified that he is employed with defendant at CCI and that he is a member of the STAR Team, which he described in similar terms as Lieutenant Ball. Clemmons also testified that during STAR Team operations, he typically wears either a green, black, or camouflage uniform rather than his standard corrections officer uniform. Clemmons recalled that on the day in question, he and Corrections Officer Horton transported a death row inmate somewhere that morning, and when they returned to CCI they were told that they needed to conduct a STAR Team transport to take plaintiff to SOCF. Clemmons stated that he and Horton then went to the "hub area" at CCI and waited until plaintiff was processed through the medical department for a routine check performed on outbound inmates.

{¶15} Clemmons testified that he was the person involved with changing plaintiff into transport clothing, and he stated that he did not use any force on plaintiff while

doing so or at any other time that day. Moreover, Clemmons testified that he did not observe Corrections Officer Horton or Lieutenant Ball, whom he stated also made the trip to SOCF, use force on plaintiff. Clemmons recounted that when they arrived at SOCF, Horton, Ball, and himself escorted plaintiff inside the institution and plaintiff seemed to be fine and had no apparent injuries. Clemmons stated that he also did not see anyone at SOCF twist plaintiff's handcuffs. According to Clemmons, nothing about the transport stood out as unusual.

{¶16} Janis Reiter, R.N. testified that she is employed with defendant at SOCF, and that her responsibilities include performing exams and preparing a Medical Exam Report for inmates whenever they have been involved in a use of force incident, an accident or altercation, or when they are transferred into or out of the institution, so as to document their condition. Reiter stated that she completed a Medical Exam Report showing that she saw plaintiff on August 19, 2014, at 3:20 p.m., and in that document she wrote that plaintiff appeared to be healthy, with no visible injuries, and that plaintiff said he did not need to be checked. (Defendant's Exhibit 4.) Reiter stated that she also prepared other routine medical paperwork as part of plaintiff's admission into SOCF, none of which reflects any complaints or signs of trauma or abuse. (Defendant's Exhibits 3, 5.) Reiter also stated that a Medical Exam Report dated September 17, 2014, corresponding to the examination that plaintiff said occurred in response to his complaints, was prepared and signed by Nurse Teresa Hill, R.N.

{¶17} Lynnea Mahlman testified that she is employed by defendant as the Inspector of Institutional Services at SOCF, a role with responsibilities that include reviewing inmate complaints and investigating inmate allegations against staff. Mahlman stated that a record of Informal Complaint Resolution (ICR) forms filed by inmates is maintained by her office, and that the first ICR plaintiff filed about this matter was submitted on September 16, 2014, to the warden's office. Mahlman explained that,

in response, the warden directed her to provide plaintiff with a grievance form so that plaintiff could formally report what he was alleging to be an undocumented use of force.

{¶18} Mahlman testified that when she receives a formal grievance from an inmate, she typically interviews the inmate in her office to get names, specific details, and any other pertinent information that the inmate may not have included in the grievance. According to Mahlman, she interviewed plaintiff in her office but he could not identify any specific SOCF staff members or physically describe them, and he had few specific details other than alleging that unknown staff members assaulted him in the J-1 housing unit. Mahlman stated that plaintiff started off the interview by talking about events at CCI, at which time she advised him that she only had authority to investigate allegations arising out of SOCF. Mahlman testified that after the interview, she obtained a staff sign-in log from the receiving area where plaintiff passed through when he arrived at SOCF, and she also looked at the shift roster for the J-1 housing unit to determine which staff were on duty on the day in question. As Mahlman testified, she then interviewed relevant staff members, including Lieutenant Frazie, Lieutenant Bauer, and Corrections Officer Neff. Mahlman further testified that upon the conclusion of her investigation, she prepared a decision addressing plaintiff's grievance in the form of a written Disposition of Grievance dated November 4, 2014. (Defendant's Exhibit 9.)

{¶19} Lieutenant William Bauer testified that he is employed with defendant at SOCF, and among other duties he is involved with receiving inmates who are transported to the institution. Bauer stated that he remembers interacting with plaintiff on August 19, 2014, and he further stated that he did not use force on plaintiff that day, nor did he witness anyone else do so. On cross-examination, Bauer also denied giving any kind of order for other staff to assault plaintiff. Bauer authenticated an Incident Report that he prepared on November 3, 2014, in response to Mahlman's investigation. (Defendant's Exhibit 10.) In the incident report, Bauer wrote that he and Lieutenant Frazie processed plaintiff into the institution, that plaintiff received medical and mental

health checks, that he and Frazie then escorted plaintiff to the J-1 housing unit, and that he did not use force or see anyone else do so.

{¶20} Lieutenant Philip Frazie testified that he is employed with defendant at SOCF.    Like Lieutenant Bauer, Frazie testified that his responsibilities include overseeing the process of inmates being transferred into the institution.  Frazie denied using any force on plaintiff or seeing anyone else do so on the day in question, either when plaintiff arrived at SOCF or when plaintiff was escorted to the J-1 housing unit. Frazie authenticated an Incident Report that he prepared on October 27, 2014, in response to Mahlman's investigation.  (Defendant's Exhibit 11.)  In the incident report, Frazie wrote that he processed plaintiff into the institution, and that after plaintiff received the requisite medical and mental health checks, plaintiff was escorted by Frazie and Bauer to the J-1 housing unit, all being accomplished without force being used.

{¶21} As previously stated, this case was tried on plaintiff's claims for assault, battery, or negligence arising from the alleged excessive use of force against him on August 19, 2014, as well as a claim of negligence arising from the medical care and treatment associated with the injuries that plaintiff allegedly sustained from the use of force.

{¶22} The underlying allegations based on the alleged use of force shall be addressed first.

{¶23} "To prove assault under Ohio law, plaintiff must show that the defendant willfully threatened or attempted to harm or touch the plaintiff offensively in a manner that reasonably placed the plaintiff in fear of the contact.  To prove battery, the plaintiff must prove that the intentional contact by the defendant was harmful or offensive.  Ohio courts have held that, in a civil action for assault and battery, the defendant has the burden of proving a defense of justification, such as the exercise of lawful authority." (Citations omitted.)  *Miller v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No.

12AP-12, 2012-Ohio-3382, ¶ 11.  "To recover on a negligence claim, a plaintiff must prove by a preponderance of the evidence (1) that a defendant owed the plaintiff a duty, (2) that a defendant breached that duty, and (3) that the breach of the duty proximately caused a plaintiff's injury." *Ford v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 05AP-357, 2006-Ohio-2531, ¶ 10.  "Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being." *Ensman v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 06AP-592, 2006-Ohio-6788, ¶ 5.

{¶24} "The use of force is sometimes necessary to control inmates." *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-477, 2013-Ohio-289, ¶ 17. "Pursuant to Ohio Adm.Code 5120-9-01(C)(1)(a), correctional officers 'may use force only to the extent deemed necessary to control the situation.'  Additionally, correctional officers 'should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury.' Ohio Adm.Code 5120-9-01(C)(1)(b)." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-804, 2014-Ohio-1810, ¶ 16.  "Excessive force" is defined at Ohio Adm.Code 5120-9-01(B)(3) as "an application of force which, either by the type of force employed, or the extent to which such force is employed, exceeds that force which reasonably appears to be necessary under all the circumstances surrounding the incident."

{¶25} Additionally, Ohio Adm.Code 5120-9-01(B)(1) provides, in part:

{¶26} "(a) The mere application and use of restraints (such as handcuffs, waist or leg restraints) in connection with accepted procedures such as the transport, escort or movement of an inmate shall not in itself be considered a reportable use of force.

{¶27} "(b) The use of one's hands with minimal force such as may be necessary or incidental to the application of restraints, or to restrain, guide, support, or direct, etc., an inmate during procedures such as the transport, escort or movement of an inmate shall not in itself be considered a reportable use of force."

{¶28} Upon review of the evidence presented at trial, the magistrate finds as follows. At approximately 8:00 a.m. on August 19, 2014, plaintiff punched a corrections officer in the face in the kitchen at CCI after she told him not to give out extra portions of food. An investigation immediately followed. Plaintiff was examined at 9:40 a.m. by Nurse McQuate, who saw no signs of injury. Plaintiff was brought to the captain's office, where he provided a statement. Prison officials decided to transport plaintiff to SOCF as a result of what happened that morning. Plaintiff was processed out of CCI in preparation for the transport and he was then escorted to the receiving and departure area. Corrections Officer Clemmons assisted plaintiff with changing into the appropriate clothing for the transport, and plaintiff was placed in the appropriate restraints. Lieutenant Ball and Corrections Officers Clemmons and Horton then escorted plaintiff to a van and accompanied him to SOCF. Once at SOCF, Ball, Clemmons, and Horton escorted plaintiff out of the van and into the institution, where they turned him over to SOCF personnel, including Lieutenants Bauer and Frazie. Plaintiff was processed into SOCF and underwent a medical examination by Nurse Reiter, who saw no signs of injury and was told by plaintiff that he was fine. Plaintiff was then escorted to a cell in the J-1 housing unit by Bauer and Frazie.

{¶29} The magistrate finds that employees at both institutions may have used their hands with minimal force as may have been necessary to apply restraints such as handcuffs and leg irons to plaintiff, or to guide or escort plaintiff from one place to another, but any such force was privileged and not excessive, and otherwise there was no force used upon plaintiff. Plaintiff's version of events, which includes no less than four separate beatings, one lasting 30 minutes straight, and also includes a cover-up involving numerous staff members at two different prisons, is almost entirely reliant upon his own testimony and strains credibility. While plaintiff chiefly complained of suffering broken ribs and a wrist or hand injury, there were no medical records or testimony from medical professionals to substantiate this, and in fact the Medical Exam

Reports from SOCF and the testimony of Nurse Reiter indicate that he suffered no such injuries. Plaintiff also had difficulty identifying people throughout his testimony and his testimony was at times inconsistent and difficult to follow. The witnesses called by defendant provided a more convincing version of events, corroborated by documentary evidence, including the Medical Exam Report prepared by Nurse Reiter. Simply put, the evidence presented by defendant outweighs the evidence presented by plaintiff. Accordingly, the magistrate finds that plaintiff failed to prove a claim for assault, battery, or negligence based upon his allegations of excessive force.

{¶30} Turning to plaintiff's claim of negligence arising from the medical care and treatment that he received for the injuries he claims to have suffered on August 19, 2014, "[i]n order to support a cause of action for medical negligence, [plaintiff] must show the existence of an applicable standard of care within the medical community, a breach of that standard of care by the defendant, and that such breach was the proximate cause of the injury sustained." *Campbell v. Ohio State Univ.*, 10th Dist. Franklin No. 04AP-96, 2004-Ohio-6072, ¶ 10, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131 (1976); *see also Gordon v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1058, 2011-Ohio-5057, ¶ 67 ("The *Bruni* standard applies to an inmate's claim for medical malpractice."). "Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 38 (10th Dist.), citing *Bruni* at 130-131.

{¶31} Plaintiff's complaint sets forth very few allegations concerning his claim of medical negligence, but it refers to this theory as malpractice and it challenges the care rendered by Dr. Ahmed. Plaintiff was required to put on expert testimony to support any such claim of malpractice. Due to the absence of expert testimony, there can be no liability in this case arising from the treatment, care, or diagnosis rendered to plaintiff by any medical professional employed by defendant. Whatever medical issues plaintiff

may have had during the relevant time period, he failed to establish a breach of duty and resultant harm and consequently did not prove his claim.

{¶32} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶33} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

 

_____
ROBERT VAN SCHOYCK
Magistrate

cc:

Lawrence Thomas, #535-336
Ohio State Penitentiary
878 Coitsville-Hubbard Road
Youngstown, Ohio 44505

Christopher L. Bagi
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed May 12, 2016**
**Sent To S.C. Reporter 6/17/16**