[Cite as *Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 2020-Ohio-4910.]

| | |
|---|---|
| JOHN GYSEGEM, et al. | Case No. 2018-00113JD |
| Plaintiffs | Judge Patrick M. McGrath |
| v. | <u>DECISION</u> |
| OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

**Introduction**

{¶1} Plaintiffs John ("Tim") Gysegem and Cheryl Gysegem bring claims of medical negligence and loss of consortium against defendant Ohio State University Wexner Medical Center (OSUWMC). The Gysegems' claims arise from two surgeries at OSUWMC that Daniel Eiferman, M.D. performed on Tim Gysegem—a laparoscopic appendectomy on February 24, 2015, and a laparoscopic cholecystectomy on March 27, 2015. The Gysegems contend that Dr. Eiferman failed to remove an appendicolith during the laparoscopic appendectomy. Plaintiffs also contend that Dr. Eiferman failed to thoroughly search for gallstones after gallstones spilled from an EndoCatch bag during the laparoscopic cholecystectomy and that Dr. Eiferman failed to thoroughly irrigate Gysegem's abdominal cavity during the laparoscopic cholecystectomy. The Gysegems maintain that Dr. Eiferman's alleged medical negligence during the laparoscopic surgeries proximately caused Tim to sustain abdominal infections and proximately caused Cheryl to sustain a loss of consortium.

{¶2} The case proceeded to a bench trial on issues of liability and damages. The court permitted the parties to submit proposed findings of fact and proposed conclusions of law. The court ordered the parties in their post-trial submissions to briefly address the Gysegems' request to submit into evidence an unfiled discovery deposition of Matthew Matasar, M.D., M.S.

{¶3} Both parties filed proposed findings of fact and proposed conclusions of law. The Gysegems, however, have not addressed in their post-trial filing their request to submit into evidence the discovery deposition of Dr. Matasar. OSUWMC maintains in its post-trial filing that the Gysegems have failed to comply with Civ.R. 32(A) (use of depositions in court proceedings). OSUWMC asserts that the Gysegems therefore are precluded from submitting into evidence any portion of Dr. Matasar's testimony from the deposition.

{¶4} Pursuant to Civ.R. 32(A), every deposition intended to be presented as evidence "must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing." *See Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 46 (trial courts "have a duty to ensure proper adherence to the governing rules, including Civ.R. 32(A), in order to afford fairness to all parties"). The court finds that the Gysegems have not shown good cause to permit the filing of Dr. Matasar's deposition into evidence.

## I. FINDINGS OF FACT

{¶5} The Gysegems were married on September 15, 1995. (Tr., 192.) During the last five years Tim Gysegem suffered pain resulting from his surgeries at OSUWMC. (Tr., 258.) Tim's surgeries and complications from the surgeries have affected the Gysegems' marriage. (Tr., 221-222, 226, 258.)

{¶6} Tim Gysegem previously worked as an x-ray technician; he has worked as an associate in the plumbing department of Lowe's since February 2019. (Tr., 250, 251, 258.) Cheryl Gysegem has been a nurse since 1989. (Tr. 192.) At some point Cheryl stopped working full-time so that she could care for Tim because she was familiar with what Tim had undergone and because she thought that she, instead of a home health nurse, had a better sense of changes that may have been happening to Tim. (Tr., 215.) On August 1, 2016, Cheryl Gysegem (who became a certified nurse consultant in 2011) retired from a nursing position at OSUWMC. (Tr., 222-223.)

**A. Laparoscopic Appendectomy in February 2015 at OSUWMC**

{¶7} In February 2015 Tim Gysegem—who has been diagnosed with, among other things, monoclonal B cell lymphocytosis—presented to the emergency room at OSUWMC after he experienced abdominal pain and other symptoms, including fever and nausea. (Joint Exhibit 1, Tab 1; Joint Exhibit 3; Tr., 194, 297.) Patients with monoclonal B cell lymphocytosis may have an increased risk of infection. (Joint Ex. 3.)

{¶8} On February 23, 2015, a CT scan was performed on Tim Gysegem. (Joint Exhibit 1, Tab 11.) A radiologist noted that the CT scan showed "an extraluminal collection containing an air-fluid level adjacent to the appendix with an appendicolith in this region, measuring approximately 2.6 x 4.4 cm (image 100, series 2). This is consistent with a contained fluid collection secondary to perforated appendicitis." (Joint Exhibit 1, Tab 11.) An extraluminal collection in layman's terms is an abscess. (Tr., 299.) An appendicolith typically is a hardened ball of stool that may be a nidus for an infection. (Tr., 72, 320; Deposition of Hari Nathan, M.D., 16-17.)

{¶9} The emergency department requested a surgery consultation. (Tr., 297.) Dr. Eiferman, M.D. (a faculty member at The Ohio State University since 2010) was the on-call surgeon; Dr. Eiferman responded to the emergency department's request. (Tr., 291-292, 297; Defense Exhibit 1.)

{¶10} Dr. Eiferman has been board certified in general surgery and surgical critical care, since 2010 and 2011, respectively. (Tr., 290-291.) Dr. Eiferman estimates that, as of February 2015, he had performed about 100 to 200 laparoscopic appendectomies. (Tr., 309.) Dr. Eiferman described his practice as typically consisting of intra-abdominal surgeries—"hernia, gallbladders, appendix, bowel resection, ulcer surgeries; cases like that." (Tr. 289-290.)

{¶11} On February 24, 2015, Dr. Eiferman performed a laparoscopic appendectomy on Tim Gysegem at OSUWMC. (Tr., 291-292, Joint Exhibit 1, Tab 7.) Dr. Eiferman does not have a specific recollection of the laparoscopic appendectomy

that he performed on Gysegem.  (Tr., 309.)  The surgical note from the surgery does not reference whether the appendicolith identified in the CT scan of February 23, 2015 was removed during the laparoscopic appendectomy.  (Joint Exhibit 1, Tab 7.)

{¶12} Dr. Eiferman testified that he would have used a surgical instrument to "get out what's inside that abscess cavity, that pus, any stones, any inflammatory debris." (Tr., 317.)

{¶13} Tim Gysegem was discharged from the hospital on February 26, 2015 with instructions to follow up with Dr. Eiferman. (Joint Exhibit 1, Tab 3.)

**B.  Readmission to OSUWMC in March 2015 and Outpatient Follow-up Visit**

{¶14} Tim Gysegem became feverish, he started to turn yellow, and he had pain in his right side about two to three days after he went home.  (Tr., 196.)  Tim and Cheryl Gysegem returned to the emergency room at OSUWMC.  (Tr., 196; Joint Ex.1, Tab 12.) Tim Gysegem was readmitted to OSUWMC.  (Joint Exhibit 1, Tab 17.)

{¶15} On March 1, 2015, a CT scan of Tim Gysegem's abdomen and pelvis was performed.  (Joint Ex. 1, Tab 21.)  A physician who reviewed the CT scan wrote in a section labeled "IMPRESSION;"

4.  Mild thickening and fluid attenuation inferior to the liver, bordering the right perinephric fascia. There is a tiny density within this area of thickening, not seen previously. Although well separated from the site of appendectomy, the findings may reflect a small amount of complicated fluid, with a small calcification/ calcified structure, of uncertain relationship to the previously inflamed appendix.

5.  Gallbladder mildly dilated, possibly due to fasting. Multiple dependent gallstones again demonstrated. Choledocholithiasis is again demonstrated.  * * *.

(Joint Exhibit 1, Tab 21.)

{¶16} On March 3, 2015, Tim Gysegem underwent an endoscopic retrograde cholangiopancreatography (ERCP) with sphincterotomy to evaluate a potential biliary obstruction.  The medical note following the ERCP shows that numerous "stones" and sludge were removed.  (Joint Exhibit 1, Tab 14, Tab 17.)

{¶17} An interventional radiology team was consulted to aspirate a fluid collection. (Tr., 196-197, 326; Joint Exhibit 1, Tab 16.)  On March 4, 2015, the interventional radiology team drained 10 ml of fluid, which was sent for culture.  (Joint Exhibit 1, Tab 16; Tr. 196-197, 326.)

{¶18} On March 9, 2015, Tim Gysegem was discharged from OSUWMC with instructions to schedule a follow-up appointment with Dr. Eiferman. (Joint Exhibit 1, Tab 14.)  At the follow-up appointment Dr. Eiferman recommended a laparoscopic cholecystectomy to remove Tim Gysegem's gallbladder.  (Tr., 197-198, 328.)

## C.  Laparoscopic Cholecystectomy in March 2015 at OSUWMC

{¶19} On March 27, 2015, Dr. Eiferman performed a laparoscopic cholecystectomy on Tim Gysegem at OSUWMC.  (Joint Exhibit 1, Tab 24.)  A physician who assisted Dr. Eiferman dictated a surgical note that was reviewed by Dr. Eiferman. (Exhibit J, Dr. Eiferman Deposition.)  The surgical notes states that Gysegem's gallbladder "was * * * placed into an EndoCatch bag, however, during removal from the umbilical port, the EndoCatch bag did open.  Despite this, the gallbladder was able to be removed out in one complete piece.  We searched around the surgical areas and found that there was no evidence of any stones that had dropped or scattered in the abdomen.  The gallbladder fossa was then irrigated copiously." (Exhibit J, Dr. Eiferman Deposition; Joint Exhibit 1, Tab 24.)  Dr. Eiferman did not perform a complete peritoneal lavage based on concern that to do so may result in adverse consequences, such as spreading bile in the body's cavity.  (Tr., 333.)

## D.  Exploratory Laparotomy in October 2015 at OSUWMC

{¶20} Tim Gysegem began to have pain at the port site where the laparoscopic surgeries were performed. (Tr., 201.) Later "green, pussy fluid" began to drain from the port site on Gysegem's body. (Tr., 201.)

{¶21} In October 2015 Tim Gysegem met with Dr. Eiferman; Dr. Eiferman ordered a CT scan of Gysegem's abdomen and pelvis. (Joint Exhibit 1, Tab 28.) A physician who interpreted the CT scan noted, among other things, a "fluid collection with irregular thick soft tissue rim anteriorly in the anterior abdomen that tracks into the periumbilical area with probable external communication. This could be a chronic postoperative collection/hematoma. Superimposed infection is difficult to exclude. No definite contrast noted within this collection." (Joint Exhibit 1, Tab 28.)

{¶22} On October 8, 2015, Dr. Eiferman performed an exploratory laparotomy on Tim Gysegem during which Dr. Eiferman found an abscess and seven calculi (stones) in Gysegem's belly button. (Tr., 342-343.) Dr. Eiferman theorizes that the calculi "must have somehow gotten out of the gallbladder" and became lodged in the area where Dr. Eiferman later discovered them. (Tr., 343.) Dr. Eiferman testified that he thinks that the stones that were found in 2015 are likely related to the gallbladder surgery. (Tr., 409.)

### E. Subsequent Follow up at OSUWMC

{¶23} In July 2016 Tim Gysegem experienced right upper quadrant pain. (Joint Exhibit 1, Tab 105.). Jonathan R. Wisler, M.D. evaluated Gysegem because Dr. Eiferman was unavailable. (Joint Exhibit 1, Tab 105.) On July 21, 2016, Dr. Wisler indicated in a progress note that he would order a CT scan and RUQ ultrasound. (Joint Exhibit 1, Tab 105.)

{¶24} A physician, who reviewed a CT scan of July 22, 2016, wrote: "IMPRESSION: 1. Rim-enhancing septated fluid collection posterior to the right hepatic lobe. This is amenable to percutaneous drainage. 2. A few small fluid collections are seen near the transverse colon, too small for drain placement." (Joint Exhibit 1, Tab 35.)

{¶25} A physician, who reviewed an ultrasound of July 25, 2016, wrote: "IMPRESSION: 1. No gallstones are seen in the visualized portion of the common bile duct. 2. Fluid collection posterior to the liver, similar to prior CT. This could represent a hematoma or an abscess." The physician who reviewed the ultrasound discussed the results with Dr. Eiferman on July 25, 2016. (Joint Exhibit 1, Tab 105.)

{¶26} Dr. Eiferman consulted members of an interventional radiology team who decided to aspirate the fluid collection in the right upper flank by means of ultrasound guidance. (Joint Exhibit 1, Tabs 38 & 39.) The procedure of July 27, 2016 resulted in the aspiration of 300 milliliters of green purulent fluid and the placement of a drain. (Joint Exhibit 1, Tab 41.) Tim Gysegem was discharged on July 29, 2016 with instructions to see Dr. Eiferman on August 9, 2016. (Joint Exhibit 1, Tab 37.)

{¶27} Tim Gysegem saw Dr. Eiferman as scheduled. During the appointment Dr. Eiferman removed the drain. (Joint Exhibit 1, Tab 104.)

{¶28} Dr. Eiferman and other medical professionals at OSUWMC periodically saw Tim Gysegem during the next twelve months or so. (Joint Exhibit 1.) Gysegem underwent removal of an abdominal wall abscess in October 2016, drainage of a chest wall abscess in November 2016, drainage of a perihepatic fluid collection in January 2017, and drainage of an abdominal wall abscess in June 2017. (Joint Exhibit 1, Tabs 47, 52, 59, 71.)

{¶29} On August 15, 2017 Tim Gysegem presented to the OSUWMC emergency department due to, among other things, shortness of breath, increasing fatigue, muscle aches, and confusion. (Joint Exhibit, Tab 75.) A CT scan of August 16, 2017 suggested: "Interval enlargement of loculated perihepatic fluid collection along the right posterior lateral aspect of the liver. Sterility of this collection cannot be determined on CT." (Tr., 481; Joint Exhibit 1, Tab 84.)

{¶30} Steven M. Steinberg, M.D. (who at the time was head of the surgery division and who had recruited Dr. Eiferman to the surgical team) was consulted. (Tr.,

491.) Dr. Steinberg—a professor of surgery at The Ohio State University who has held faculty appointments at the State University of New York at Buffalo, Tulane University, and Case Western Reserve University and who is a self-described acute care surgeon (Tr., 435, 438)—estimated that, as of 2017, he had performed "hundreds" of appendectomies and treatment of ruptured appendixes and "hundreds" of laparoscopic cholecystectomies. (Tr., 436.) Cheryl Gysegem described Dr. Steinberg as "wonderful" because he was "to the point" in his interactions with the Gysegems. (Tr., 216.)

{¶31} Dr. Steinberg advised the Gysegems that the CT scan demonstrated an abscess in an area not previously seen and that it had encompassed the right lung, had gone through the diaphragm, and had invaded the chest. (Tr., 221-222, 481.) Dr. Steinberg recommended an exploratory laparotomy with an incision and drainage of the fluid collection. (Tr., 216-217, 481-482; Joint Exhibit 1, Tab 80.) According to Dr. Steinberg, he "was concerned at the time that there was retained, either stone or fecalith, that was causing the abscess to recur." (Tr., 482.)

{¶32} Dr. Steinberg performed an exploratory laparotomy on August 17, 2017. Dr. Steinberg found the right lobe of Tim Gysegem's liver adhered to the anterior abdominal wall. (Tr., 482; Joint Exhibit 1, Tab 80.) According to a surgical note (which Dr. Steinberg edited), "3-400 ml of pus" was obtained; the pus was cultured, suctioned, and irrigated until the fluid ran clear. Dr. Steinberg explored the abscess cavity using curettes and a finger, looking for foreign bodies such as retained gallstones. None were identified. (Joint Exhibit 1, Tab 80; Tr., 482-483.) Dr. Steinberg did not perform a complete peritoneal lavage; instead he irrigated the abscess cavity, above the liver and on the inside of the abscess cavity itself. (Tr., 484.)

{¶33} Tim Gysegem saw Dr. Steinberg for follow-up care. (Tr., 485.)

{¶34} In October 2017 Dr. Steinberg ordered a CT scan because Tim Gysegem began to exhibit symptoms again, i.e., night sweats and complaints of not feeling well. (Tr., 485.) The report of the CT scan indicated: "1. Interval resolution of the perihepatic

fluid collection identified on prior studies. Interval removal of the previously identified perihepatic drain. 2. Redemonstration of pneumobilia, likely related to prior sphincterotomy and cholecystectomy. 3. Stable hyperdense lesions within the bilateral kidneys, likely representing hemorrhagic or proteinaceous cysts. 4. Nonobstructive right renal calculi." (Joint Exhibit 1, Tab 86.)

{¶35} In December 2017 Dr. Steinberg ordered a CT scan because Tim Gysegem's symptoms had worsened. (Tr., 486-487; Joint Exhibit 1, Tab 108.) A CT scan of December 19, 2017 showed, among other things, a new oval collection medial to the liver dome, which could have been a subphrenic abscess or a sterile collection. (Joint Exhibit 1, Tab 87.)

{¶36} Dr. Steinberg asked a thoracic surgeon to become involved in Tim Gysegem's care. (Tr., 487.) The thoracic surgeon recommended another surgery to drain the area identified on the CT scan. (Tr., 487.) During the surgery Dr. Steinberg drained the component of the abscess that was in the abdomen and a thoracic surgeon drained the collection that was in the chest. Dr. Steinberg also inquired of another surgeon about other possible approaches. The other surgeon did not have any other ideas. (Tr., 487-488.)

{¶37} Dr. Steinberg last saw Tim Gysegem in an office visit in January 2018. (Joint Exhibit 1, Tab 108.) Dr. Steinberg sent a letter wherein he terminated the physician-patient relationship after the Gysegems initiated this litigation. (Tr., 241-242, 488-489.)

## II. CONCLUSIONS OF LAW

{¶38} The Gysegems are required to establish their civil claims of medical negligence and loss of consortium by a preponderance of the evidence. *See Weishaar v. Strimbu*, 76 Ohio App.3d 276, 282, 601 N.E.2d 587 (8th Dist.1991). A preponderance of the evidence "is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its

nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54.

{¶39} To recover against a defendant in a tort action, a plaintiff "must produce evidence which furnishes a reasonable basis for sustaining his claim. If his evidence furnishes a basis for only a guess, among different possibilities, as to any essential issue in the case, he fails to sustain the burden as to such issue." *Landon v. Lee Motors, Inc.*, 161 Ohio St. 82, 118 N.E.2d 147 (1954), paragraph six of the syllabus.

{¶40} On the trial of a civil case (or criminal case), the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The court is the trier-of-facts in this case. The court is free to give weight to the evidence and the court is free to believe all, part, or none of the testimony of the witnesses who have appeared before the court in this case. *See State v. Green*, 10th Dist. Franklin No. 03AP-813, 2004-Ohio-3697, ¶ 24.

{¶41} Generally, an employer or principal "is vicariously liable for the torts of its employees or agents under the doctrine of respondeat superior." *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438, 628 N.E.2d 46 (1994). If a physician is an employee or agent of a hospital or medical center, then liability may be imposed upon the hospital or medical center for any negligent acts performed by that physician under the doctrine of respondeat superior. *See Latham v. Ohio State Univ. Hosp.*, 71 Ohio App.3d 535, 537-538, 594 N.E.2d 1077 (10th Dist.1991). *Accord Berdyck v. Shinde*, 66 Ohio St.3d 573, 577, 613 N.E.2d 1014 (1993). Because Dr. Eiferman was an agent of OSUWMC (a medical center) when he provided care to Tim Gysegem, OSUWMC may be liable for any negligent acts performed by Dr. Eiferman under the doctrine of respondeat superior.

{¶42} The law "imposes on physicians engaged in the practice of medicine a duty to employ that degree of skill, care and diligence that a physician or surgeon of the

same medical specialty would employ in like circumstances. * * * A negligent failure to discharge that duty constitutes 'medical malpractice' if it proximately results in an injury to the patient.  Whether negligence exists is determined by the relevant standard of conduct for the physician.  That standard is proved through expert testimony. * * * Neither the expert nor the standard is limited by geographical considerations. * * *." *Berdyck* at 579.

{¶43} The Supreme Court of Ohio has discussed requirements for establishing medical malpractice and the concept of standard of care:

> "The standard of care required of a medical doctor is dictated by the custom of the profession:
>
> 'In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances * * *.'"

*Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 93, 529 N.E.2d 449 (1988), quoting *Bruni v. Tatsumi*, 46 Ohio St. 2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus.

{¶44} The court finds, and the parties seemingly agree, that the standard of care for the laparoscopic appendectomy required Dr. Eiferman to search for and remove the appendicolith identified in the pre-surgery CT scan, so long as the appendicolith could be safely removed.  (Tr.*,* 75-76, 320, 411, 445, 468-470; Nathan Deposition, 17-18.)

{¶45} Ralph Silverman, M.D. (the Gysegems' expert witness) opined that a calcification shown on the CT scan of March 1, 2015 is "obviously from an

appendicolith" because no surgical interventions had been performed on Tim Gysegem since the laparoscopic appendectomy. (Tr., 90-91.)

{¶46} The court is not convinced that the calcified structure identified on the CT scan of March 1, 2015, is an appendicolith, as opined by Dr. Silverman. A post-appendectomy CT scan (CT scan of March 1, 2015) identified "a small calcification/ calcified structure, of uncertain relationship to the previously inflamed appendix"—not an appendicolith. Hari Nathan, M.D. (an expert witness for OSUWMC) testified that the calcification that is seen on the CT scan of March 1st is in a different part of the abdomen, that the calcification is contained within some inflammatory soft tissue, and that the calcification is about half the size of what Dr. Nathan measured the appendicolith to be. (Nathan Deposition, 97.) Dr. Steinberg (a fact witness and expert witness for OSUWMC) testified that the calcification/calcified structure was smaller than the previously identified appendicolith, so that "it's most likely not the same thing." (Tr., 463-464.) Dr. Steinberg further noted that the original appendicolith (and the structure identified in the CT scan of March 1st) appeared to be calcified, and calcified appendicoliths would not change very rapidly, if at all. (Tr., 464.)

{¶47} The court generally finds that Dr. Silverman's opinions are more biased and less credible than those offered by OSUWMC's expert witnesses. Dr. Silverman lacks the credentials of the opposing experts (e.g., Dr. Silverman does not currently teach any general surgery residents and Dr. Silverman has never taught fellows in any specialty) (Tr., 142.); Dr. Silverman has demonstrated a willingness to testify outside of his area of expertise, *see Wilson v. Dean*, App. No. 334243, 2018 Mich. App. LEXIS 57, at *9 (Jan. 9, 2018) (concluding that Dr. Silverman was not qualified to testify about a general surgery standard of care because the majority of Dr. Silverman's practice was not in general surgery); and twenty to twenty-five percent of Dr. Silverman's income is generated from Dr. Silverman's case reviews and testimony, with about ninety-five percent of the reviews performed on behalf of plaintiffs. (Tr., 132.) While Dr. Silverman

asserts that he has performed "hundreds" of appendectomies and cholecystectomies in his career, Dr. Silverman admits that he performed the "overwhelming majority" of the cholecystectomies early in his career when he was engaged in more general surgery. (Tr., 65-66.)    Dr. Silverman thus has less experience with appendectomies or cholecystectomies.  With no evidence, Dr. Silverman also suggested that Dr. Eiferman exhibited a lack of care for his patients when he stated that "[y]ou have to pretend that you care and look around" (Tr., 170).  Such a suggestion demonstrates bias and affects Dr. Silverman's overall credibility, notwithstanding that, at the same time, Dr. Silverman is critical of Dr. Eiferman's professional performance.

{¶48} Dr. Eiferman's testimony that, during the laparoscopic appendectomy he would have used a surgical instrument to remove any inflammatory debris, is credible and persuasive for the proposition that the appendicolith identified in the pre-appendectomy CT scan likely was removed during the laparoscopic appendectomy. The court concludes by preponderance of the evidence that Dr. Eiferman did not breach the standard of care during the laproscopic appendectomy by failing to remove the appendicolith that was identified in the CT scan of February 23, 2015, based on the evidence presented and in agreement with OSUWMC's experts.  (Tr. 468; Nathan Deposition, 28-30). *See Berdyck v. Shinde*, 66 Ohio St.3d 573, 584, 613 N.E.2d 1014 (1993) (whether a standard of care articulated by an expert witness governs a duty of care is a question of fact, determined from all relevant facts and circumstances).

{¶49} With respect to the laparoscopic cholecystectomy, the court determines that the opening of an EndoCatch bag during a laparoscopic cholecystectomy is a recognized complication of that type of surgery.  (Nathan Deposition, 38; Tr. 547.) When an EndoCatch bag opens during the extraction of a gallbladder in a laparoscopic cholecystectomy, the standard of care requires a surgeon to remove the gallbladder from a patient's body, inspect the immediate vicinity of the gallbladder extraction and, if stones are identified, to remove the stones, and irrigate the area to ensure that spilled

bile, blood, or stones has been completely evacuated.  (Nathan Deposition, 38-39; Tr., 450-453.)

{¶50} Based on the evidence presented and in agreement with OSUWMC's experts, the court finds by a preponderance of the evidence that Dr. Eiferman met the standard of care during the laparoscopic cholecystectomy when he searched the surgical areas and when, after he found no evidence of any gallstones that had dropped or scattered in the abdomen, he "copiously" irrigated the gallbladder fossa.   (Tr., 471; Nathan Deposition, 36-38.)

{¶51} Dr. Eiferman has theorized that some gallstones "must have somehow gotten out of the gallbladder" and became lodged in the area where Dr. Eiferman later discovered them during an exploratory laparotomy.  (Tr., 343.)   Dr. Eiferman also testified that he thinks that the stones that were found in 2015 (i.e., during the exploratory laparotomy) are likely related to the gallbladder surgery.  (Tr., 409.)

{¶52} The Supreme Court of Ohio, however, has held: "A presumption of negligence is never indulged from the mere fact of injury, but the burden of proof is upon the plaintiff to prove the negligence of the defendant and that such negligence is a proximate cause of injury and damage."  *Ault v. Hall*, 119 Ohio St. 422, 422, 164 N.E. 518 (1928), paragraph one of the syllabus.  Because Dr. Eiferman acted within the standard of care during the laparoscopic cholecystectomy, the court concludes that a presumption of negligence may not be indulged from the fact gallstones may have spilled during the surgery.  *Accord Turner v. Children's Hosp., Inc.*, 76 Ohio App.3d 541, 548, 602 N.E.2d 423 (10th Dist.1991), citing *Ault*, *supra* (no presumption of malpractice from the mere fact of injury).

{¶53} While the court does not know the precise cause of Tim Gysegem's recurring infections, the evidence does not establish that OSUWMC, through Dr. Eiferman, failed to meet the standard of care in either the laparoscopic appendectomy or laparoscopic cholecystectomy.  Consequently, the Gysegems cannot

prevail on their claim of medical negligence against OSUWMC.  *See Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, 950 N.E.2d 605, ¶ 38 (10th Dist.) (to establish a cause of action for medical malpractice, a plaintiff is required to show, among other things, a breach of that standard of care by the defendant).

{¶54} A claim for loss of consortium is a derivative claim in that the claim is dependent upon a defendant's having committed a legally cognizable tort upon a spouse who suffers bodily injury.  *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 93, 585 N.E.2d 384 (1992).  Because the Gysegems have not proven by a preponderance of the evidence that OSUWMC should be held liable for the tort of medical negligence, the court concludes that the claim for loss of consortium fails.

### III. Conclusion

{¶55} The court holds that the Gysegems have not proven by a preponderance of the evidence that OSUWMC should be held liable for medical malpractice or a derivative loss of consortium.  The Gysegems' request to submit into evidence the previously unfiled discovery deposition of Dr. Matasar should be denied.

_____
PATRICK M. MCGRATH
Judge

[Cite as *Gysegem v. Ohio State Univ. Wexner Med. Ctr.*, 2020-Ohio-4910.]

| | |
|---|---|
| JOHN GYSEGEM, et al. | Case No. 2018-00113JD |
| Plaintiffs | Judge Patrick M. McGrath |
| v. | <u>JUDGMENT ENTRY</u> |
| OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

{¶56} For the reasons set forth in the decision filed concurrently herewith, the court DENIES plaintiffs' request to submit into evidence a previously unfiled discovery deposition of Matthew Matasar, M.D., M.S. Judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

PATRICK M. MCGRATH
Judge

Filed September 8, 2020
Sent to S.C. Reporter 10/15/20