[Cite as *Carr v. Ohio Dept. of Rehab. & Corr.*, 2022-Ohio-3649.]

| JASON L. CARR | Case No. 2021-00083JD |
|---|---|
| Plaintiff | Magistrate Gary Peterson |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, brings this action for medical malpractice arising out of medical treatment plaintiff received in August 2017. The case proceeded to trial before the undersigned magistrate. For the reasons that follow, the magistrate finds that plaintiff failed to prove his case by a preponderance of the evidence.

**Findings of Fact**

{¶2} In the beginning of August 2017, plaintiff was transferred to Corrections Reception Center (CRC). At that time, plaintiff was in good physical health and considered himself physically active while frequently engaging in activities such as soccer, weightlifting, and running. Plaintiff had no previous history of cardiac or pulmonary difficulties. Although he was on a prescription for Paxil, plaintiff believed that it was only to treat bipolar disorder and not anxiety, with which he claimed he had not been previously diagnosed. However, it was established that plaintiff did suffer from anxiety. (Plaintiff's Exhibit 1; Defendant's Exhibit A, bates 000007).

{¶3} On August 15, 2017, plaintiff was playing basketball in the prison recreation yard with a large group of men. Plaintiff described the game as rough, and as plaintiff attempted to rebound the basketball, his full weight landed on his left leg and plaintiff fell to the ground in pain. Medical personnel responded and subsequently transported plaintiff to the medical center where he received x-rays, Motrin, ice, and crutches, and

thereafter plaintiff returned to his dormitory.  (Plaintiff's Exhibit 2; Defendant's Exhibit A, bates 000014-000018).

{¶4} Kenneth Saul, D.O., a board-certified physician in family medicine and chief medical officer at CRC, examined plaintiff on August 17, 2017.  Dr. Saul diagnosed plaintiff with a depressed fracture of the left tibial plateau, and noted that plaintiff was unable to bear weight, had mild swelling at the fracture site, and had pain and tenderness proximally to the tibia.  The tibial plateau is the superior part of the tibia and is the bone directly below the knee.  Plaintiff's vital signs were normal, and plaintiff was otherwise healthy.  Dr. Saul referred plaintiff for an orthopedic appointment, prescribed Ultram for pain management, moved plaintiff to the medical dormitory, and provided plaintiff with a wheelchair.  (Plaintiff's Exhibit 3; Defendant's Exhibit A, bates 000019-000020).

{¶5} On August 18, 2017, plaintiff was in the shower when he began experiencing chest pain and shortness of breath.  Plaintiff related that he nearly fell to the ground, but another inmate caught him and helped him to a chair.  Medical personnel escorted plaintiff to the medical department where a nurse performed an EKG.  Plaintiff related to the nurse that he experienced shortness of breath and a rapid heart rate, although he was no longer experiencing those symptoms when he arrived in the medical department.  The nurse subsequently contacted Dr. Saul, who was unsure whether the nurse contacted him once or twice regarding this visit.  Dr. Saul, who reads all EKGs ordered at the facility, read plaintiff's EKG and determined that it was normal.  The physical copy of the EKG is not in the medical records.  If plaintiff had a pulmonary embolism, the EKG would have shown a right strain pattern, but there was no such pattern.  The nurse reported no edema while diagnosing plaintiff with anxiety.  The nurse advised plaintiff to contact the nearest staff member when experiencing chest pain and to return to the clinic if there was no improvement by August 20, 2017.  Plaintiff was subsequently returned to the medical dormitory.  (Plaintiff's Exhibit 4; Defendant's Exhibit A, bates 000022-000025).

{¶6} Plaintiff continued to experience chest pain subsequent to August 18, 2017, and plaintiff reported to corrections officers that he was experiencing chest pain although plaintiff added that the pain was not to the same degree as the first episode on August 18, 2017. Plaintiff and corrections officers did not report chest pain to any medical personnel prior to plaintiff's follow-up appointment with Dr. Saul on August 22, 2017, and there is no persuasive evidence that plaintiff attempted to return to the clinic as the nurse instructed on August 18, 2017.

{¶7} On August 22, 2017, Dr. Saul examined plaintiff at a follow-up appointment for complaints of chest pain. Dr. Saul documented that plaintiff's chest pain was left anterior and worse with deep breath. Dr. Saul noted that plaintiff did not have leg swelling or ankle swelling although plaintiff's calf was ecchymotic (black and blue discoloration), which is to be expected because of plaintiff's fracture disrupting blood flow. Dr. Saul performed a physical examination and took plaintiff's vitals including his heart rate, respiratory rate, and blood oxygenation, which were all normal. Dr. Saul noted that plaintiff was not in any apparent distress, did not have shortness of breath, did not have calf tenderness, or a cord. Dr. Saul added that plaintiff was standing at some point during the visit. Dr. Saul concluded that plaintiff was experiencing anxiety, although he did not refer plaintiff to the mental health department because plaintiff was already on the mental health case load. Dr. Saul ruled out other causes for plaintiff's chest pain because of the physical exam, EKG, vital signs, and plaintiff's previous anxiety diagnosis. (Plaintiff's Exhibit 5; Defendant's Exhibit A, bates 000028-000029).

{¶8} On August 24, 2017, plaintiff was transferred to the Franklin Medical Center (FMC) for an orthopedics consultation with Dr. Sullivan. After evaluating plaintiff, Dr. Sullivan ordered a prophylactic dose of Lovenox and venous doppler ultrasound. Dr. Sullivan also noted calf tenderness, which was a new clinical finding. While Dr. Sullivan's note is dated August 23, 2017, it was established by multiple witnesses and other medical records that Dr. Sullivan saw plaintiff on August 24, 2017, not on the 23rd.

{¶9} Shortly after the consultation with Dr. Sullivan, plaintiff experienced a rapid change in his clinical status. Plaintiff began sweating and his heart began beating rapidly; plaintiff subsequently passed out. Plaintiff recalled that he awoke and was surrounded by medical personnel. Plaintiff attempted to use the restroom at that time. Kristen Lawson, R.N., encountered plaintiff as he was lying on the floor. Plaintiff was adamant that he needed to use the restroom and Lawson helped plaintiff to the toilet; however, plaintiff became unresponsive while on the toilet and did not have a pulse. Lawson and another medical staff member lifted plaintiff off the toilet and placed him on the ground. After confirming that plaintiff did not have a pulse, Lawson commenced CPR. Multiple nurses were helping with the resuscitative efforts. The nursing team also used the AED to shock plaintiff's heart on multiple occasions. Plaintiff did not have a pulse for 15 minutes, but plaintiff's pulse did return after the efforts of defendant's medical staff, and he was transported by squad to the emergency room at Ohio State University (OSU). Plaintiff recalled waking up in the ambulance. (Plaintiff's Exhibits 6-8, 21; Defendant's Exhibit A, bates, 000031-000041, Defendant's Exhibit B).

{¶10} Medical personnel at OSU determined that plaintiff suffered an acute massive saddle pulmonary embolism with extension into the bilateral lungs along with pulmonary infarcts. Plaintiff also suffered rib fractures due to the CPR chest compressions. (Plaintiff's Exhibits 9-12). Plaintiff remained at OSU for several days and was discharged back to FMC on August 28, 2017. (Plaintiff's Exhibit 23; Defendant's Exhibit A, bates 000043-000053). Plaintiff was transferred back to CRC on October 20, 2017. (Plaintiff's Exhibit 24; Defendant's Exhibit A, bates 000443-000444).

{¶11} Plaintiff was subsequently diagnosed with post traumatic stress disorder and has what he describes as flashbacks to these events. Plaintiff remains on a blood thinner medication and gets his blood checked on a weekly basis. Plaintiff no longer participates in sports, weightlifting, or running because he fears what could happen if he were to be injured. Otherwise, plaintiff has recovered from his injuries.

**Conclusions of Law and Analysis**

{¶12} Plaintiff's claim is based upon a theory of medical malpractice. "In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained." *Tobin v. Univ. Hosp. E.*, 10th Dist. Franklin No. 15AP-153, 2015-Ohio-3903, ¶ 14, citing *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 19. "Expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, 950 N.E.2d 605, ¶ 38 (10th Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-131, 346 N.E.2d 673 (1976). The Supreme Court of Ohio established the legal standard for medical malpractice in *Bruni*:

{¶13} "In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations." *Id.* at 129-130. "The instant case, 'in simple terms, was a battle of the experts' as to whether the standard of care was breached." *Gysegem v. Ohio State Univ. Wexner Med. Ctr.,* 10th Dist. Franklin No. 20AP-477, 2021-Ohio-4496, ¶ 74 (internal citations omitted).

{¶14} Plaintiff presented the expert testimony of Donato Borrillo, M.D., a physician licensed to practice medicine in Ohio and nine other states. Dr. Borrillo received his medical degree from State University of New York and predominantly practices in

occupational medicine, preventative medicine and wound care, and hyperbarics. Dr. Borrillo also holds a Juris Doctorate from Case Western Reserve University, practicing law for approximately four or five hours per week.

{¶15} Dr. Borrillo testified that he would have prescribed an oral anticoagulant on August 17, 2017, because the orthopedics consultation was not going to occur for another week. Dr. Borrillo explained that there is an increased risk of developing a deep vein thrombosis (DVT) with tibial plateau fractures and because of the length of time between his diagnosis and referral to orthopedics, he would be concerned about potential clotting. Dr. Borrillo added that pain in plaintiff's leg is a sign of a DVT and that plaintiff was reporting pain even as far back as August 17, 2017. Dr. Borrillo also expressed skepticism regarding the nursing note dated August 18, 2017, chiefly because the nurse wrote that the EKG was normal. Dr. Borrillo testified that a nurse cannot read an EKG as it is beyond the scope of a nurse's practice.

{¶16} Dr. Borrillo opined that plaintiff was experiencing a DVT and had venous thromboembolisms occurring between the 18th through the 22nd. Dr. Borrillo noted that plaintiff began experiencing chest pain and that his chest pain progressively worsened.

{¶17} Dr. Borrillo testified that on August 22, 2017, plaintiff had signs and symptoms of a DVT, but plaintiff's symptoms of chest pain were incorrectly attributed to anxiety, which he considered to a be a breach of the standard of care. Dr. Borrillo added that the medical records do not support anxiety as a diagnosis because there is no formal mental status exam, no referral for mental health treatment, and no reference to past medical history of anxiety. Dr. Borrillo believed that plaintiff should have been prescribed an anticoagulant rather than diagnosed with anxiety.

{¶18} Due to an error in the medical record, Dr. Borrillo mistakenly believed that Dr. Sullivan saw plaintiff on August 23, 2017; however, as noted above, the overwhelming evidence established that Dr. Sullivan saw plaintiff on August 24, 2017. Dr. Borrillo testified that Dr. Sullivan ordered an ultrasound and prescribed Lovenox at a prophylactic

dose, rather than a treating dose.  Dr. Borrillo explained that Dr. Sullivan was prophylaxing, rather than treating an embolism or a clot, because of the tibial plateau fracture and a concern for a possible DVT.  Ultimately, Dr. Borrillo believed that, had a blood thinner been prescribed as the standard of care required in his view, plaintiff would not have experienced a saddle pulmonary embolism on August 24, 2017.

{¶19} Defendant presented the expert testimony of Michael Yaffe, a board-certified physician in internal medicine who is starting his 40th year of practice and maintains a full internal medicine practice.  Dr. Yaffe earned his medical degree from Ohio State University in 1980.

{¶20} Dr. Yaffe testified that someone who has a DVT, which is a clot that forms in a vein, should have inflammation, tenderness, swelling, redness, warmth, and/or possibly a dilated vein that feels like a cord.  Dr. Yaffe explained that a pulmonary embolism is a clot that has formed in a vein and breaks off, moving toward the lungs and gets lodged in a pulmonary artery.  Dr. Yaffe testified that chest pain, cough, drop in oxygen saturation level, coughing up blood, pain while taking a deep breath, and possibly a change in heart rhythm are signs of a DVT and a pulmonary embolism.  Dr. Yaffe added that he has treated hundreds of patients with such complications.

{¶21} Dr. Yaffe opined that the standard of care does not require treatment of a tibial plateau fracture with blood thinners. Dr. Yaffe explained that the main risk of anticoagulant medications is increased risk of bleeding.  Dr. Yaffe clarified that the standard of care contemplates the fact that plaintiff is non-ambulatory and that it is not the standard of care to use prophylactic blood thinner just because the patient is non-ambulatory. Dr. Yaffe testified that the risk of using a prophylactic blood thinner outweighs any benefit to the prophylaxis.

{¶22} Dr. Yaffe testified that following plaintiff's complaint of chest pain on August 18, 2017, the EKG finding was normal.  Dr. Yaffe explained that an EKG is a

straightforward way to determine any irregularity of heart rhythm or heart rate, blood flow around the heart, and strain on the heart muscle.

{¶23} Dr. Yaffe testified that on August 22, 2017, plaintiff was not exhibiting signs of a DVT. Dr. Yaffe explained that there was no inflammation, no swelling, no redness, no increased warmth, and no changes in pulse. Dr. Yaffe testified that plaintiff was not exhibiting signs of a pulmonary embolism such as air hunger or compromised air flow and that plaintiff's oxygen level was normal, blood pressure was normal, and heart rate was normal. Dr. Yaffe explained that the most consistent finding of a pulmonary embolism is a fast heart rate, which plaintiff did not have. Dr. Yaffe added that plaintiff did not have calf tenderness or cords. Dr. Yaffe noted that plaintiff has a past medical history of anxiety. Concerning plaintiff's complaints of chest pain, Dr. Yaffe explained that chest pain is not significant on its own and that patients who have an untreated pulmonary embolism tend to follow a course that has some symptoms but none of the typical symptoms were observed by medical staff. As a result, Dr. Yaffe concluded that plaintiff was not experiencing a DVT or a pulmonary embolism.

{¶24} Dr. Yaffe testified that on August 24, 2017, when Dr. Sullivan evaluated plaintiff, plaintiff had a normal heart rate. Dr. Yaffe explained that Dr. Sullivan noted that plaintiff's calf was tender and ordered a venous doppler but did not indicate that it was emergent; Dr. Sullivan also prescribed Lovenox at a prophylactic dose rather than a treating dose. Dr. Yaffe testified that shortly after the evaluation with Dr. Sullivan, plaintiff experienced a sudden development of a pulmonary embolism that led to cardiac arrest and was transferred to OSU for treatment. Dr. Yaffe explained that a pulmonary embolism can develop in as little as 10 minutes and that there is nothing in the medical records to support a conclusion that plaintiff had a pulmonary embolism prior to August 24, 2017; however, Dr. Yaffe acknowledged that it was possible that blood clots broke off and traveled to plaintiff's chest causing pain.

{¶25} Dr. Yaffe testified that the expected course for a patient who survives a pulmonary embolism is for the clot to be reabsorbed and resolved in the body over time. Dr. Yaffe testified that plaintiff's lung infarct would completely heal on its own. Dr. Yaffe opined that plaintiff did not suffer long-term harm or permanent injury as a result of these events.

{¶26} As stated previously, plaintiff failed to prove his claim by a preponderance of the evidence. The magistrate finds that Dr. Yaffe's testimony was more authoritative and persuasive than the testimony of Dr. Borrillo. Dr. Yaffe practices entirely in internal medicine and routinely sees patients similar to plaintiff. By contrast, Dr. Borrillo primarily focuses on occupational medicine, preventative medicine and wound care, and hyperbarics. Dr. Borrillo's experience of dealing with patients with DVTs is primarily in the area of wound care, whereas Dr. Yaffe routinely deals with fractures and frequently treats patients with DVTs.

{¶27} Regarding the standard of care, Dr. Yaffe credibly and persuasively testified that the standard of care did not require the prescription of blood thinners before August 24, 2017. Plaintiff had no prior history or family history of DVTs or clotting. Plaintiff was otherwise healthy at that time. Furthermore, Dr. Yaffe credibly testified that a tibial plateau fracture is not treated with a blood thinner. Dr. Yaffe explained that there are risk factors involved with prophylactic blood thinner treatment, such as bleeding, and that such risks outweigh the potential benefit. Dr. Yaffe further explained that all patients with this type of fracture are going to be non-ambulatory and that the standard of care takes that into account.

{¶28} With respect to plaintiff's chest pain that he experienced beginning on August 18, 2017, Dr. Yaffe credibly explained the signs and symptoms common to both a DVT and a pulmonary embolism. The medical records do not report the typical features such as calf tenderness, calf swelling, redness, increased warmth, or a cord. Additionally, the medical records do not report difficulty breathing, cough, drop in oxygenation, or a change

in heart rhythm. Plaintiff underwent an EKG on August 18, 2017, and the EKG finding was normal. Plaintiff's vitals were normal both on August 18, 2017, and August 22, 2017. As a result, plaintiff's medical records do not support the conclusion that plaintiff was suffering from a DVT or a pulmonary embolism beginning as early as August 18, 2017, as Dr. Borrillo claimed.

{¶29} Furthermore, Dr. Borrillo expressed skepticism regarding the nursing note dated August 18, 2017. Nevertheless, Dr. Saul credibly testified that he reviews all EKGs that are ordered and that he reviewed plaintiff's EKG results, which were normal. Additionally, Dr. Borrillo incorrectly identified Dr. Sullivan's evaluation as having occurred on August 23, 2017; Dr. Borrillo acknowledged during his examination that he had difficulty understanding the timeline of events. However, the evidence established that Dr. Sullivan evaluated plaintiff on August 24, 2017. As a result, Dr. Borrillo was under the mistaken impression that Dr. Sullivan's orders for a venous doppler and a prophylactic dose of blood thinner were ignored for perhaps a full day. However, it was established that plaintiff suffered a saddle pulmonary embolism shortly after meeting with Dr. Sullivan.

{¶30} The evidence established that plaintiff experienced a sudden change in status on August 24, 2017. Dr. Sullivan's finding of calf tenderness on August 24, 2017, was a change in clinical status that was not recorded earlier. Furthermore, rather than providing a treating dose of blood thinner, Dr. Sullivan prescribed a prophylactic dose, indicating no emergent threat. Additionally, Nurse Lawson described plaintiff as talking and interacting followed by a rapid change in his clinical status to the point where he was experiencing a cardiac arrest. As a result, the magistrate finds that Dr. Yaffe's opinion that plaintiff developed a sudden pulmonary embolism on August 24, 2017, is more credible and persuasive than the opinion's offered by Dr. Borrillo.

{¶31} Plaintiff argues that defendant's medical staff improperly attributed plaintiff's complaints of chest pain beginning on August 18, 2017, to anxiety. However, Dr. Yaffe credibly testified that chest pain itself is not significant and that plaintiff was not suffering

Case No. 2021-00083JD                    -11-                              DECISION

any significant heart or lung issues on August 18 or August 22, 2017.  In short, plaintiff's vitals, results of his physical examination, and EKG findings do not support the profile of someone suffering from a DVT or a pulmonary embolism prior to August 24, 2017.

{¶32} Plaintiff bore the burden of proving by a preponderance of the evidence that defendant's medical staff breached the standard of care.  Plaintiff failed to meet that burden, and as a result, it is recommended that judgment be entered in favor of defendant.

{¶33} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

GARY PETERSON
Magistrate

**Sent to S.C. Reporter 10/13/22**